## FELTON *v.* BROWN.

### Opinion delivered March 18, 1912.

1. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.—A chancellor's finding of facts which is clearly against the preponderance of the evidence will be set aside. (Page 663.)

2. LACHES—DELAY.—Where a daughter accepted a conveyance from her father in consideration of her release of any interest in his estate, and waited for twenty-five years, and until he had been dead for three years, before seeking to rescind the release for alleged fraud, she is precluded by her laches. (Page 663.)

3. HOMESTEAD—DOWER—ABANDONMENT.—Where a widow, in pursuance of a family agreement, conveyed her homestead and dower interests in certain lands of her husband to one of his heirs, she will be held to have abandoned her rights therein. (Page 664.)

4. FAMILY SETTLEMENT—ENFORCEMENT.—Where a widow and two of the heirs agree that a sum of money left by the deceased husband should go to one of the heirs to equalize his share of the estate, and such agreement was executed, it will be enforced as between the parties to it. (Page 668.)

Appeal from Lonoke Chancery Court; *James B. Reed,* Special Chancellor; reversed in part.

*Trimble, Robinson & Trimble,* for appellants.

1. Mary A. Felton was entitled to her homestead right in the entire 160 acres. The decree setting aside the release from Alice L. Lamb is not supported by the evidence. The interplea should have been dismissed. She was estopped. 13 Cur. Law, note 58, par. 17, p. 1598; 56 W. Va. 611; 64 S. E. 911; 81 Kan. 210; 106 *Id.* 279.

2. Where a parent executes a series of deeds to children, evidence of what he said is competent on question of advancement. 81 Kan. 210.

3. Grantor's statements nearly a year after conveyance are inadmissible to show that property was not transferred as an advancement. 91 N. E. 364.

4. The $550 in the bank was no part of the estate; it belonged to Louis Felton.

*A. C. Martineau,* for appellees.

1. The widow abandoned her homestead. 21 Cyc. 608; Thompson on Homest. & Ex., § 267; 48 Ark. 236; 20 Cyc. 932, 973; 62 Ark. 61.

2. The evidence sustains the finding as to Alice Lamb. 9 Cyc. 454, § 2; Anson on Cont. p. 216. It was obtained by undue influence and there was no consideration. 9 Cyc. 456, § 6; 40 Ark. 28; 20 Cyc. 110, 111, 112.

3. There was no gift to Louis Felton, either *causa mortis* or *inter vivos.* 60 Ark. 169.

WOOD, J. 1. This a suit by the appellant, Mary A. Felton, to have homestead allotted and dower assigned to her in certain real and personal property. She is the widow of Marion Felton, deceased. At the time of his death he owned and occupied 160 acres of land, which constituted his homestead. He also owned about 193 acres of other land, twenty acres of which were well improved and adjoined the homestead on the west. The rest was unimproved. He owned personal property of the value of something more than $400, and had in the bank $550.

His children were Alice, George, Garland, Watt, Louis, Carrie and Media. Louis and Carrie were the youngest, and lived with Felton and his wife at the time of Felton's death. After his death Carrie intermarried with one Brown, and before his death Media had intermarried with one B. F. Smith, Alice was also married. Louis and Carrie, and her husband. Brown, were made parties defendant to the suit. The defendant Louis Felton did not resist the claim of appellant Mary A. Felton. The defendant Carrie Brown and her husband filed an answer and cross complaint, in which they set up that a certain agreement had been entered into between appellant Mary A. Felton, and Louis and Carrie, by which certain of the real estate and personal property belonging to her father at the time of his death was allotted to appellant Mary A. Felton as her share, and prayed that said agreement be carried out. She made Louis a defendant to her cross complaint. Louis and Mary A. replied to the answer and cross complaint, in which they denied the agreement alleged therein, and set up

that instead there was a different agreement entered into between them as to the division of the property.

The appellee Alice Lamb was the daughter of Marion Felton by a former wife, and a half-sister of Carrie Brown and Louis Felton. She intervened in the suit, claiming one-third interest in the estate of her father, Marion Felton.

Mary A. Felton and Louis Felton answered the intervention, denying that Alice Lamb had any interest in the subject-matter of the suit as one of the heirs of Marion Felton; alleged that she had received her interest by way of advancement, and that as evidence of that fact she had executed a deed of release unto the other heirs of all her interest in the estate. Alice Lamb replied to this answer, admitting that she did sign the deed of release, but alleging that same was obtained by fraud and undue influence, and that there was no consideration paid for same. She prayed that the deed of release executed by her be set aside and cancelled.

The court found that the deed of release executed by Alice Lamb was procured from her by her father, Marion Felton, by undue influence, and was without consideration and void, and entered a decree cancelling the same and allotting to her a one-third interest in the estate making her share equally with her half-brother, Louis Felton, and her half-sister, Carrie Brown.

This presents the first question for our attention.

There was adduced in evidence a deed executed by Alice Lamb to the heirs of Marion Felton, in which, for an alleged consideration of $1,100, she released unto the other heirs all of her "right, title and interest in and to the real and personal estate of the said Marion Felton."

There was testimony on behalf of appellee Alice Lamb tending to show that she inherited forty acres of land from her mother. Alice Lamb testified that on the 23d of November, 1880, she joined with her father and with her stepmother, Mary A. Felton, in conveying her interest in the land she inherited from her mother to one Edward Chapman; that on the same day her father and Mary A. Felton conveyed to her (she then being unmarried), in exchange for this land, the eighty acres on which she now resides; that she afterwards married with Eagle, and immediately took possession of the eighty acres conveyed to her by her father in exchange for her interest in her mother's

estate. She stated that she and her husband built a house on the property, and that in July, 1884, the house burned, and with it the deed which she had received from her father to the eighty acres, but which had never been recorded. She further testified that after the deed was destroyed she asked her father to make her a new deed, but this he refused to do unless she would execute a deed of release. She stated that her father represented to her that she would lose her title to the land, and that she, being ignorant of the law and relying upon him, executed the release in evidence to the other heirs. She further testified that the consideration named in the release of $1,100 was never paid her by her father, and that he had never given her anything in money or property, and that the only consideration for the release was the deed of her father to the eighty acres of land on which she was then residing.

There was evidence in her behalf tending to show that the land she inherited from her mother, which she claims to have given in exchange for the eighty acres deeded to her by her father was very valuable, being cleared and on a public road, and hat the land which her father deeded to her in exchange was at the time unimproved and worth only about $300; that soon after the exchange was made her husband began to pay taxes on the same. The deed of release was executed on the 29th day of May, 1885, over four years after the alleged deed of Alice Lamb conveying to her father her interest in her mother's estate.

Witness H. T. Bradford testified, concerning the deed of release, that the same was acknowledged before him as justice of the peace; that he had no recollection as to whether any money consideration was talked of or not at the time. He gave it as his opinion that the consideration was a certain tract of land she got. He said that in his opinion a deed which bears the same date as the deed of release was the consideration the $1,100 mentioned in the deed of release.

Mary A. Felton testified concerning this, that the land that Alice inherited from her mother was not more valuable than the land she got from her father; that the land that she inherited from her mother was about worn out; that Alice received as much of the estate as the other children; she got eighty acres of land and a horse, also a cow and calf; that Mr. Felton, during his life-

time made advancements to his children as they became of age and married. Alice got her part just as the others had got their parts. The eighty acres of land she got was good land; between twelve and fifteen acres of it was fenced, and had been worked a year. She saw Alice frequently after Mr. Felton conveyed her the land, and Alice never expressed any dissatisfaction. On the contrary, she said that she got the pick of the estate; that she got a fine piece of land that would make her a good home, and she was well satisfied with it. She sold to her father the land that she inherited from her mother. Witness knew Alice's father paid her for the land.

George Felton testified that his father made provision for all of the children except Louis and Carrie during his lifetime; that he gave them their part of the estate. The same arrangements were made with Alice as were made with the others. The eighty acres given to Alice were given her as her part of the estate. He gave her also horses, cows and hogs, and gave to her husband at that time provisions to run the place. "When any of us married," said the witness, "Pa would give us our part of the estate. The only ones he didn't provide for were the two youngest, Carrie and Louis. Alice got as much as the balance of us did. I signed my right to the balance of the heirs when I got my part of the estate, and so did she."

Another one of the heirs, W. L. Felton, testified substantially to the same state of facts. And these witnesses say that their father put up himself one house on the eighty acres of land that he gave Alice as her part and helped put up another that was burned. One of these witnesses said that when Alice went to marry her father told her that she would have to have a home, and he was going to give her that eighty acres of land. "Father said to her: 'I have a mare here I will give you and put you up a house on that land for your interest in the Burris place,'" referring to the land Alice Lamb inherited from her mother. Witness further stated that Alice accepted it, and he never heard of her making any complaint regarding the part of the estate she got from her father until after the suit came up, which was twenty-five or thirty years after she had received the eighty acres of land from her father.

Carrie Brown testified that she heard her father say that

he gave Mrs. Lamb the eighty acres where she was living for her interest in his estate.

The testimony of all these witnesses was to the effect that it was the intention of their father that Carrie and Louis, the youngest children, should share equally in the estate that was undisposed of at the time of his death, reserving to Mrs. Mary A. Felton her homestead and dower interest.

We are of the opinion that the court erred in finding that the deed of release executed by Alice Lamb to the other heirs was procured by her father under undue influence and without consideration. The clear preponderance of the evidence tends to show that this release was executed in consideration of the fact that she had before received her share of the estate, and was in recognition of that fact. It is scarcely believable that the father. who is shown to have been so generous and fair to all of his children in the disposition of his estate, and so careful to provide for them, would have deliberately set out to deceive his daughter, Alice, and misrepresent the facts to her, as she claimed he did. We are of the opinion that the preponderance of the evidence shows that she received ample consideration for the land which she inherited from her mother, and which she afterwards conveyed at her father's request.

But, whether this is true or not, she is estopped by laches from setting up that the deed of release executed by her to the estate at the instance of her father was void for fraud and misrepresentation. She was of full age at the time this deed was executed, and was under no disability. She married a few weeks after the deed of release was executed. Even if it could be said that she was under her father's influence at the time the same was executed, after her marriage and when she had moved away from him, it could not be said that there was any presumption of undue influence, and certainly none is shown by the evidence. She waited for about twenty-five years, and until this suit was brought, before taking any steps to have such release cancelled for the deception and fraud which she now claims her father perpetrated upon her in order to have her execute such release. If her father defrauded her out of her interest in her mother's estate, as she now claims, it was her duty to have sought the interposition of a court of equity long before her

father's mouth was sealed in death. It does not speak well for her to have waited until her father had died and then set up her claim which necessarily involves the integrity of his character. She should have made known her objections before his death, but even after his death she waited nearly three years before she indicates any dissatisfaction.

The decided preponderance of the evidence shows that the deed of release was not fraudulently obtained. It was based upon a valid consideration, and is binding upon her. *Squires* v. *Squires*, 65 W. Va. 611, 64 S. E. 911; 13 Current Law, p. 1598, par. 17, note 58. The court therefore erred in annulling the deed of release, and in decreeing to appellee Alice Lamb one-third of the estate of her father.

2. Concerning the allotment of homestead and dower, Carrie Brown testified substantially as follows: "I entered into an agreement, after my father died, with mother and Louis as to a division of the real estate. My father had planned as to what part he wanted for Louis and for myself on the home place. I was to get eighty acres of the home place and the twenty acres west of the home place. Louis was to get the balance of the home place. We all made a division of the property. We deeded Louis his part. He and mother wanted to make a deed for my part. The deed we made was acknowledged before J. S. Williams. Mr. Williams also wrote the deed I was to have. The deed that was made to my part, my mother had it, and was going to put it on record. I don't know why she didn't put it on record. It was written up and signed in the fall of 1908. Louis got more of the land in the bottom to equal mine. Louis was to receive the $550 my father had on deposit in the bank to make the improvements on his place equal to mine. This was part of the consideration. I was to have the property all my life; mother give me possession of it under the agreement. We were to all live together as one family. Father suggested the division during his lifetime. He told mother and Louis how he wanted the property divided on the home place. When the division was made, mother was to have the homestead as long as she lived."

J. S. Williams testified that after Marion Felton's death Mrs. Felton wanted him and Trimble to divide the property between her daughter, Carrie, and her son, Louis. They made

a division of the property, and divided it equally. He testified also to a division of the real estate. He prepared the deeds. Mrs. Felton stated that she wanted everything settled during her lifetime. Each deed contained the same number of acres. Mrs. Felton refused to relinquish her dower in any of the land. One clause in the deed was that she was to control her daughter's part, that is the home place, during her lifetime. She said she wanted it divided by the ditch like Mr. Felton wanted it divided, and that the money in the bank was to make the improvement on Louis' part equal to Carrie's. There was a second deed made in which Mrs. Felton relinquished her dower to the part that Louis was to receive. He didn't think that they divided the home place. They made a division of about 175 acres in the bottom. Nothing was said by Mrs. Felton about sixty acres being reserved for herself in the division. Mrs. Felton was to control the land that was deeded to Carrie Brown jointly during her lifetime. He made two deeds, one to Louis and one to Carrie.

Mrs. Felton testified that after her husband died they undertook a division of the personal property to carry out his wishes. She said there was a talk of a division of the real estate after Carrie married, but that it was never done. She at first stated that no deed was ever executed; said that Carrie would not sign the deed; said that in the division she (Mrs. Felton) was to get sixty acres of land absolutely as her own, and the children were to take the rest; that the whole matter of the division of the real property went through because Carrie refused to sign the deed. But in her cross examination she stated as follows: "The first division was that Louis was to get half of the real estate, and Carrie and me were to get the other half, but I was to hold her part while I lived, and hold all the farming tools; and what was left at my death, that was hers. Carrie and myself signed Louis a deed. The first partition was made; Mr. Williams, a justice of the peace, made the deed. I never delivered any deeds. The deeds were made to me. Carrie refused to sign. It was not the understanding that I was to hold Louis' part, just as I was Carrie's part. I declared to Carrie and Louis that I was going to hold her part as my homestead as long as I lived, but that I was going to deed Louis his

part absolutely without any restrictions. After I made the deed to Louis, I didn't expect to claim homestead right in the part that Louis got. Carrie and her husband were at the house when they married; I didn't object to the marriage. I never asked Mr. Brown to come and live with me; he just came anyway, and took possession of the premises; there was no understanding between him and me. When Mr. Brown and Carrie married, there was no ill-feeling existing between us. The first trouble came up about a year after we made a partition. The deed that Mr. Williams drew up to Carrie, I never turned over to her. I was keeping the deed for her; expected to turn it over to her at my death; that was the agreement. After she married, I wanted to arrange so that I could build a house for them to live in because I was tired of living with them, or they with me, for it looked like they were trying to shut me out, and I had an agreement that I would take sixty acres in the two deeds, thirty from Louis and thirty from Carrie. I stated to her that I was going to do this, and she never said a word. this didn't have anything to do with the partition made a year or two before."

At another place in her testimony she says: "The understanding was, when it was divided, that Carrie's part should remain on the place until after my death. Mr. Felton expressed an idea as to how he wanted the land divided between Louis and Carrie before his death, reserving the right of homestead and dower interest. My intention was to reserve my homestead in such a manner as not to be disturbed."

Louis Felton testified: "My understanding was that mother was to deed me mine and my sister hers, and I was to deed mother thirty acres and my sister was to deed mother thirty acres, and she was to take the sixty acres and do with it as she pleased. I agreed to this."

On cross examination, he says: "We agreed to have a division of the personal property and real estate. I was to get half of the personal property, and my mother was to get the other half for Carrie; that is, Carrie's part was to remain on the place, and my mother was to have the control and use of it. It was agreed in the first arrangments, but didn't go through until the other deed was made. I made Carrie a deed to her part

of the property. I think that was in the fall or spring after my father died. Something like a year after the first partition was made, I moved on my part and took possession. I drew the money that was in the bank."

The court, upon this testimony, found that, in pursuance of an agreement, "deeds were executed by Louis Felton to Mary A. Felton and Carrie Felton, and delivered to Mary A. Felton, and deeds were executed and delivered by Mary A. Felton and Carrie Felton to Louis Felton; that Mary A. Felton went into possession and held the same as her dower and homestead for more than two years, until the filing of this suit; that Louis Felton went into posession of the part deeded to him immediately after said agreement, and has held the same since that time.

The court further found that the deed executed and delivered to Louis Felton by Mary A. Felton and Carrie Felton was without consideration and void as between Louis Felton and Carrie Felton, and that the deed alleged to have been executed to Mary A. Felton and Carrie Felton and delivered to Mary A. Felton was never delivered to Carrie Felton, and was without consideration and void as between Mary A. Felton and Louis Felton.

The court further found, after describing the lands that were conveyed under the agreement from Mary A. and Carrie Felton to Louis Felton, that, by reason of said agreement in setting out to Mary A. Felton said homestead and dower and said conveyance to Louis Felton, she has abandoned and released all of her right, title and interest as to homestead and dower in that part of the land embraced in the deed to said Louis Felton; that she is entitled to homestead only in that part of the home place not conveyed to the said Louis Felton, and entitled to dower in all that part of the land belonging to the estate of Marion Felton not embraced in the deed of conveyance to the said Louis Felton, and entered a decree according to his findings.

The court also adjudged and decreed "that Louis Felton account to Carrie Brown and Alice Lamb for the $550 received from the Bank of Central Arkansas, and also for rents amounting to $160 collected for the year 1910 on land in his possession.

The court, in its decree, specifically described the lands set apart as homestead and dower, and gave her dower, in addition to the homestead, out of the lands that were embraced in the deed executed by her and Carrie to Louis.

The plaintiff, Mary A. Felton, appealed from the decree in so far as the same affected her homestead and dower rights. Louis Felton also appealed. The appellees Carrie Brown and Alice Lamb appealed, but their appeal seems to have been abandoned. The attorney for them closes his brief by asking that the decree of the lower court be affirmed.

We are of the opinion that the decree of the chancellor in regard to the homestead and dower rights of the appellant Mary A. Felton is supported by a preponderance of the evidence. A decided preponderance of the evidence shows that Mary A. Felton and her children, Louis and Carrie, entered into an agreement by which they divided the property, real and personal, after Marion Felton's death, and that the parties to the agreement took possession of the respective interests allotted to them, and that the agreement was fully consummated. The effect of the agreement on the part of appellant Mary A. Felton was to abandon her homestead and dower right in the lands that were, by the agreement, allotted to Louis Felton. Such a disposition of the property was authorized under section 15 of Kirby's Digest, there being no administration and no debts.

After the appellant Mary A. Felton had once abandoned her homestead in the solemn form as indicated by her deed, under the agreement, she could not thereafter claim it. See 21 Cyc. 608, and cases cited.

3. The court was correct in its finding that the $550 deposited in the bank in the name of Marion Felton at the time of his death was the property of his estate. This $550 was not a gift, either *inter vivos* or *causa mortis*, to Louis Felton. There was some testimony tending to show that he performed services for his father, and that it was the intention of his father to reward him for such services by giving him the $550, and that it was the intention that this money should go to Louis when his father died; but, although the gift may have been intended, it was never perfected by delivery prior to Marion

Felton's death. If his father was indebted to Louis Felton, then that debt was a claim against the estate, which, to be allowed, would have to be settled in the course of administration.

Being the property of the estate. it was disposed of under the agreement, and we can see no reason why the agreement, which the evidence shows was entered into and fully consummated, should not be carried out as the parties made it. Under this agreement Louis Felton was to receive and did receive the $550 as a part of his division of the property.

The court therefore erred in cancelling such agreement as between Louis and Carrie Felton and in entering judgment in her favor for any part of the $550. The judgment therefore, in this respect, is reversed.

The decree of the court in regard to the homestead of Mary A. Felton is affirmed. In other respects it is reversed, and the cause will be remanded with directions to enter a decree in accordance with this opinion, and for such other proceedings as may be necessary pursuant to law.