WARREN *v.* MARTIN.

Opinion delivered April 20, 1925.

1.  DEEDS—FRAUDULENT MISREPRESENTATIONS.—In a suit to cancel a quitclaim deed, evidence *held* to sustain a finding that the deed was procured by fraudulent misrepresentations.

2.  DEEDS—RATIFICATION.—Where plaintiff was induced to execute a quitclaim deed through misrepresentations on which she had a right to and did rely, acceptance and retention by her for a week or ten days of money subsequently received therefor did not constitute a ratification, where plaintiff was not fully apprised of the real situation during the time she retained the money.

3.  MINES AND MINERALS—WAIVER OF FORFEITURE OF OIL AND GAS LEASE.—Since a surviving widow was entitled to receive payment of the rents under an oil and gas lease covering the homestead property, acceptance by her of payments thereof at a time and place other than that designated in the lease was a waiver of forfeiture for failure to pay rent at the time and place designated.

4.  HOMESTEAD—RIGHT OF WIDOW TO RECEIVE RENTS.—By virtue of her homestead rights, a widow is entitled to receive the rents and

profits under an oil and gas lease executed on the homestead property in the husband's lifetime.

5. HOMESTEAD—SALE BY WIDOW OF MINERAL RIGHTS.—A sale by a widow of her interest in the oil, gas and minerals in the homestead constituted an abandonment of her interest therein by virtue of her homestead right, as much as if she had sold a part of the land constituting her homestead.

6. HOMESTEAD—ABANDONMENT BY WIDOW—RIGHT OF HEIR.—Where a widow abandoned her interest in the mineral rights in the homestead by a sale and conveyance thereof, an heir of her husband became entitled to receive the rents and profits therefrom, and to have an accounting for amounts collected as royalties from the land since the date of such conveyance.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; reversed.

*John P. Streepey,* for appellant.

*T. J. Gaughan, J. T. Sifford, J. E. Gaughan* and *E. E. Godwin,* for appellee.

HUMPHREYS, J.   Two suits were instituted by appellant in the First Division of the Chancery Court of Ouachita County, one against C. M. Martin *et al.* to cancel a quitclaim deed executed by her to Mandy Johnson on July 26, 1922, for an undivided one-fourth interest in the S½ SW¼ section 29, township 15 S., range 15 W., in said county, containing 80 acres, upon the ground that it was procured through fraud; and the other against the Standard Oil Company of Louisiana *et al.,* to cancel the oil, gas, and mineral lease upon the same lands, and which S. L. Johnson, the husband of Mandy Johnson, executed to E. P. Edwards on May 19, 1919, for the term of six years, upon the ground that same automatically forfeited for failure to pay rents in accordance with the provisions in the lease.

Many pleadings were filed in the cases, but, when completed, the issues joined were whether the quitclaim deed had been obtained through fraud, whether the lease had been forfeited for nonpayment of rentals, and whether appellant was entitled to an accounting for her share of the oil which had been taken from the land. It was agreed that the cases might be tried together and

that all the testimony introduced in either case and in the case of *Jane Warren* v. *Sun Oil Company et al.* might be used in all of the cases, when pertinent and relevant.

Upon a hearing of the cause the court found that the quitclaim deed and lease were valid binding instruments upon all parties, but that C. M. Martin was indebted to appellant in the sum of $225 for her proportion of the purchase money he paid Mandy Johnson for sixty-three sixty-fourths interest in the oil, gas and mineral in said land. Pursuant to the finding, the court dismissed the bills and substituted bills for the want of equity, and rendered judgment against C. M. Martin in favor of appellant for $225, and declared a lien on the interest of C. M. Martin in the lands to secure the payment of same, from which decree appellant has duly prosecuted an appeal to this court.

The record reflects, without dispute, that S. L. Johnson, a negro, was the owner by purchase of the land in question and an adjoining forty-acre tract; that he occupied the eighty-acre tract with his wife as their homestead until his death, on October 22, 1919; that his wife has resided thereon since his death; that he left surviving him his wife, L. A. (Mandy) Johnson, his sister, Jane Warren, and his half brother, Jesse Johnson, as his only heirs; that on May 9, 1919, S. L. Johnson and wife, Mandy, executed an oil, gas, and mineral lease on said lands, including the 40-acre tract, to E. P. Edwards, trustee, in which it was provided that the lease should become *ipso facto* null and void if a well were not drilled upon the land within one year, unless the time should be extended by payment of ten cents per acre in advance as rental, the rental money to be mailed to S. L. Johnson at Louann, Arkansas, or to be deposited to his credit in the Camden National Bank of Camden, Arkansas, and that the lease should extend to his heirs as to all conditions; that the lease was assigned by E. P. Edwards, trustee, to the Standard Oil Company, in July, 1922, and

by the Standard Oil Company to the Gulf Refining Company on August 8, 1922; that Jane Warren executed a quitclaim deed for her interest in said land to Mandy Johnson on July 26, 1922; that Mandy Johnson conveyed a sixty-three sixty-fourths interest in all the oil, gas and mineral in or under said land to C. M. Martin for $2,000, subject to the gas, oil and mineral lease therein to E. P. Edwards, trustee; that S. L. Johnson executed a deed of trust upon said land to W. P. Watts & Brothers to secure a loan of $1,099 due October 1, 1918, which was assigned to E. P. Edwards on January 13, 1922; that on August 5, 1922, C. M. Martin conveyed an undivided one-half interest in sixty-three sixty-fourths of all the oil, gas, and mineral on said land to R. E. Davidson for $4,800; that on July 31, 1922, E. P. Edwards released the Watts Brothers' deed of trust to R. E. Davidson as to the one-half interest bought by him in sixty-three sixty-fourths interest in all the oil, gas and mineral in said land from C. M. Martin, which release contained a recital that R. E. Davidson obtained the conveyance of said one-half interest in said oil, gas and mineral on said land from C. M. Martin on July 28, 1922; that on July 27, 1922, Jane Warren assigned a one-half interest in said land to J. F. Driesback in consideration of his agreeing to assist her in clearing the title of said land by employing counsel to prosecute a suit to set aside the quitclaim deed she had executed to Mandy Johnson; that, after the institution of the suit, Jane Warren assigned for a valuable consideration all of her interest in said land to the said J. F. Driesback in case she should prevail in the litigation; that the rents were paid upon the Edwards lease in the following manner: the first rental payment, due May 19, 1920, was placed to the credit of S. L. Johnson in the Camden National Bank within the specified time; the second payment, due May 19, 1921, was paid directly to Mandy Johnson either in June or July, 1921; the third rental payment, due May 19, 1922, was deposited to the credit of Mandy Johnson in the Ouachita Valley National

Bank at Camden on May 17 or 18, 1922, but was not delivered to Mandy Johnson until July, 1922; that on August 3, 1923, C. M. Martin sent $125 to Jane Warren, purporting to be in full payment of her interest in sixty-three sixty-fourths interest in all the oil, gas and mineral sold in the land after paying off the deed of trust for $1,099 and accrued interest thereon; that she returned the money by postal order to C. M. Martin in about a week or ten days after receiving same, upon the advice of J. S. Driesback; that, at the time he sent the money, he also sent her a letter informing her of her interest in the land and oil, but withheld from her that the V. K. F. discovery well of the Smackover oil field had come in and was producing a large amount of oil, and also withheld the fact that oil, gas, and mineral interest in lands near the well had greatly enhanced in value. The letter contained several paragraphs indicating that the oil, gas and mineral interests in the land were of little value and that the oil boom was insignificant. The two following paragraphs are indicative that the writer intended to make such an impression upon appellant:

"There is a little oil boom on here, and Mandy Johnson has sold a part of the royalty on this land for $1,600, which is sufficient to pay off the mortgage and have $500 left to divide as follows: one-half to herself and the other one-half to be divided equally between you and your brother, Jesse Johnson. Your part of the money would be $125."

"If the oil boom amounts to nothing, then Mandy Johnson will deed back to you your interest in this land or buy it from you if you and she can agree upon a price." The letter also indicated that it was necessary to have executed the quitclaim deed to prevent Mandy from losing her home, when, in fact, the real purpose of obtaining the deed was to clear up the title of oil interests in the land which Martin had bought or intended to buy from Mandy. The price of the interests sold, or intended to be sold, was also incorrectly stated in the letter.

The record reflects a conflict between appellant's and appellee's witnesses relative to representations made to procure the quitclaim deed from appellant and Mandy Johnson.

Appellant, Pinkney Warren and Estella Warren, testified that Allen Fortch, a negro man, and Sam Evans, a white man, came to appellant's home on July 26, 1922, which was 40 miles from Camden and about 20 miles from Smackover, and obtained a quitclaim deed from appellant to Mandy Johnson for her interest in the 80-acre tract of land, upon the representation that Mandy was in distress; that there was a mortgage of $2,500 on her home, which was about to be foreclosed, and that she would lose it unless appellant conveyed her interest in the land to Mandy; and that she yielded to their entreaties and executed a quitclaim deed in order to help Mandy. These witnesses were corroborated by the testimony of Jesse Johnson, the brother of appellant, and L. J. Cook, who is a lawyer in Texarkana. Immediately after obtaining the quitclaim deed from appellant to Mandy Johnson, Fortch and Evans proceeded to Texarkana, where they found Jesse Johnson. Jesse testified that they made the same representation to him with reference to Mandy being in distress for fear she would lose her home, which, they said, was under mortgage for $2,500. He said that they represented that he would have to pay the mortgage himself unless he signed the quitclaim deed; that he asked them to go with him to the office of his lawyer, Mr. L. J. Cook, to talk the matter over; that his lawyer advised him to do nothing until they found out definitely about the mortgage, and suggested to the men that they get a verified copy of the mortgage and a certificate from the circuit clerk that it had not been satisfied.

L. J. Cook testified that Jesse Johnson came to his office in company with Allen Fortch and Sam Evans, and, when he asked them what they wanted, Evans told him that he wanted a quitclaim deed from Jesse Johnson

to Mandy Johnson in order to prevent a foreclosure of the mortagge held by Watts Brothers, who were represented by C. M. Martin; that he advised Jesse Johnson not to execute the quitclaim deed until they looked into it, and requested Evans to get a verified copy of the mortgage and sworn statement of the deed, and a certificate of the circuit clerk that the mortgage had not been satisfied; that, the next morning, Evans came to his office and told him that he had been back that night to Camden to get the papers which he requested; that, during the conversation the day before, Evans had represented to him that the mortgage was for $2,500; that, after examining the papers and a letter which C. M. Martin had written him, he told Evans that he would not let Jess sign the quitclaim deed under any circumstances; that he asked Evans if it was not a fact that he was trying to cure title to oil lands in Ouachita County, and that he said "yes;" that Evans told him Jane Warren had signed a quitclaim deed under the same representation which he had made to Jess. The letter which he received from Martin is as follows:

"C. M. MARTIN
Camden, Ark.
Attorney at Law.
July 28, 1922.,

"Mr. L. Jean Cook, Att'y at law,
"Texarkana, Ark.-Tex.

"Dear sir:  I have been employed by Mr. Sid Umstead of this city to foreclose a mortgage executed by Sam L. Johnson and wife, Mandy Johnson, to M. P. Watts & Bro., for $1,099, which mortgage Mr. Umstead has paid. Mr. Umstead does not desire to foreclose this mortgage, if the brother and sister of Sam Johnson will execute a quitclaim deed to this land, then he will give the widow of Sam Johnson more time to pay off this mortgage. If they do not sign at once, I will foreclose this mortgage, and all of the heirs of Sam Johnson will be forever barred.

"Kindly see Jesse Johnson for me and explain the facts to him, and, of course, he will sign this quitclaim deed to help out his brother's widow.

"Your friend, ·

(Signed) "C. M. MARTIN.

"P. S. I would not give the amount of this mortgage for the land, but it is close to some land Mr. Umstead owns, and he may be able to use it, if the mortgage is not paid."

Sam Evans testified, in substance, that he and Allen Fortch were employed by C. M. Martin to obtain a quitclaim deed to said land from Jane Warren to Mandy Johnson, and, in order to procure same, told her there was a mortgage of about $1,200 on it; that her brother had leased it, and that Mandy, her brother, Jesse, and she owned the land and oil interests, subject to the mortgage and lease; that there was some oil excitement over there, and the only thing to do was to execute a quitclaim deed to one person and sell the oil interests; that the mortgage would have to be paid off before they would get anything out of it; that she agreed to make the deed, so he left Allen Fortch there and went after a notary public; that, on account of a storm, he did not get back until next day, July 26, at which time Jane executed the quitclaim deed, after the notary read it to her; that he returned in about ten days and delivered her $125 and the letter which Mr. Martin sent to her; that he read the letter to her and her husband; that she kept the letter and accepted the $125, stating that she was glad she had done the right thing.

Allen Fortch testified, in substance, that he informed Jane Warren of her brother's death, of which she had not heard, and the interest she owned in the land; that he did not know the exact amount of the mortgage, but thought it was between $1,000 and $2,500; that, if they thought he was trying to persuade them into anything, to come down and pay off the mortgage; that they backed off from that; that she agreed to and next day did sign

the quitclaim deed, saying that Mandy could sell the land, pay off the mortgage, and keep the balance to live on; that, when they took her the $125 and letter from Mr. Martin, she accepted the money, saying she was glad she did right.

The notary testified that he read the deed to Jane Warren, and that she understood what she was signing.

The taxi driver who took them to Jane Warren's home testified that Jane accepted the $125, after the letter from Mr. Martin had been read and explained to her.

C. M. Martin testified that he tried to buy the oil interests in the land from Mandy Johnson, who referred him to Sid Umstead, who was looking after her interest; that Mr. Umstead agreed to let him have a sixty-three sixty-fourths interest in the oil, gas, and mineral in the land for $2,000, which he agreed to pay, and that Mr. Umstead requested him to clear the title to the land; that, in order to do so, he employed Evans and Fortch to get a quitclaim deed from Jane Warren and Jesse Johnson, who owned a one-fourth interest each in the land, and directed them particularly to inform said parties of the oil situation in the Smackover field, of their interest in the land, and to tell them, if they would make a quitclaim deed for their interest therein to Mandy, she would sell the oil, gas, and mineral interest in the land for as much as possible, pay off the mortgage and divide the balance, if any, between herself and them, according to their several interests; that, about two weeks after Jane Warren executed the quitclaim deed, he wrote her a letter explaining that Edwards was about to foreclose the mortgage, but that Mandy had sold an interest in the oil, gas, and mineral in the land for $1,600, which was more than enough to pay the mortgage, and that her share of the excess was $125, which amount Mandy had turned over to him to send her; that Mandy would hold the land in trust for her, and, after selling the oil, gas and mineral in the land and dividing the proceeds according to their

several interests, Mandy would either buy the land from her or deed her interest therein back to her; that the value of the oil, gas and mineral in the land was uncertain, and that he paid Mandy a high price for a sixty-three sixty-fourths interest therein.

Sid Umtead testified that he and Edwards owned the lease, and that they purchased the mortgage from Watts Brothers in January, 1922; that he got the best price possible for the oil, gas and mineral therein for Mandy.

E. P. Edwards testified that he was a brother-in-law of Sid Umstead; that they owned the lease and bought the mortgage together.

After a careful reading and analysis of the testimony, our conclusion of the whole transaction is as follows:

C. M. Martin, who had kept in close touch with the V. K. F. discovery well in the Smackover oil field, near the land in question, came into the possession of evidences indicating that the well would become a producer, which it did. Relying upon these evidences, he set about to buy oil, gas, and mineral interests in lands near the well, and, in carrying out these policies, entered into a contract with Mandy Johnson, through her representative, Sid Umstead, to purchase a sixty-three sixty-fourths interest in the oil, gas and mineral in said land for $2,000. and, in order to clear up the title, employed Sam Evans and Allen Fortch to procure a quitclaim deed to said land from appellant and her brother, who had inherited a one-fourth interest each therein, subject to Edwards' lease and the Watts Brothers' mortgage, for a nominal sum. The only way the deed could be obtained for a nominal consideration was to make it appear that the equity in the land was of little value and would be swallowed up by the Watts Brothers' mortgage unless appellant, her brother and Mandy should dispose of the oil, gas, and mineral interest in the land immediately. This plan was in the mind of Martin when he sent his agents, as representatives of Mandy, to appellant and

her brother to get the deed, as was evidenced by the postscript to the letter he wrote to L. J. Cook, and in the clauses quoted above in his letter to appellant. The postscript is as follows:

"I would not give the amount of this mortgage (referring to the Watts Bros.' mortgage) for the land, but it is close to the land Mr. Umstead owns, and he may be able to use it, if the mortgage is not paid."

At the time the letter was written Martin was under contract to pay $2,000 for a sixty-three sixty-fourths interest in the oil, gas, and mineral in the land, and knew that the discovery well near the land was a producer. The well came in on July 26, 1922, and the letter was written on July 28, 1922. At the time Martin wrote the letter to appellant he knew that the discovery well had become a producer, and, according to the recitation in the lease of the Watts Brothers' mortgage by E. P. Edwards to R. E. Davidson, Martin had contracted to sell one-half of sixty-three sixty-fourths interest in the oil, gas, and mineral in said land that he had bought from Mandy to R. E. Davidson for $4,800.

At the time Evans and Fortch procured the quitclaim deed from appellant, she and C. M. Martin were not on an equal footing. The same opportunity to ascertain and know the value of the land was not open to each. Martin was upon the ground, with knowledge of recent oil developments in the field, and appellant was residing at a distance, without information or knowledge that the oil well located near the land was about to, or had, come in, and that oil, gas, and mineral interests in every direction from the discovery well were in demand and being purchased. Appellant could neither read nor write and had not even heard of the death of her brother. The development in the oil field, also known to Martin, was withheld from appellant, and she was induced to execute a quitclaim deed either upon the representation that the land was of little value and that it was necessary to sign the deed immediately in order for her, her brother

and Mandy to get anything more than the mortgage out of it, or to prevent Mandy, who was in distress, from losing her home. According to Fortch's own admission, he led this woman to believe that, unless she signed the deed, she might have to pay the mortgage herself, which information seemingly produced an effect, for Fortch said "she got back from that." We are convinced by a preponderance of the evidence that appellant was induced to execute the deed through misrepresentation on which she had a right to and did rely.

Appellees contend, however, that appellant ratified the transaction by accepting and retaining $125 for a week or ten days. If she had been fully apprised of the real situation, her act in accepting and keeping the money for that length of time would have amounted to a ratification on her part. The letter, however, accompanying the money was a continuation of the misrepresentations. The oil situation was characterized in the letter as a little boom. It did not inform her that the discovery well had become a real producer. Neither did it contain information that a sixty-three sixty-fourths interest in the oil, gas, and mineral in said land had been sold to Martin himself by Mandy for $2,000, and that he had immediately sold one-half of what he purchased for $4,800. On the contrary, it was stated in the letter that Mandy had sold a part of the oil, gas, and mineral interest in said land for $1,600. The purport of the letter was to the effect that Mandy had to sell said interest in the land to prevent the mortgage from being foreclosed, when, in fact, no such urgent necessity existed. Under these circumstances the receipt and retention of the money did not constitute a ratification of the transaction by appellant.

The next question arising for solution is whether the oil, gas, and mineral lease had been forfeited for failure to pay rent at the time and place designated in the lease. S. L. Johnson and his wife executed this lease to Edwards on their homestead. Johnson died on the

—,— day of October, 1919, and his wife continued to reside on the home place. After the death of her husband, two payments of rent were made to and accepted by her, one of which was out of time and the other made at a place different from that designated in the lease. An oil well was commenced on the property before the fourth rental was due, so it was unnecessary, under the terms of the lease, to make further payments on rent. The drilling of the well operated to keep the lease alive. While the last two payments of rent were not made in accordance with the terms of the lease, and while the lease contained an automatic forfeiture clause, we know of no legal reason why the forfeiture could not be waived by Mandy if she was entitled to receive the payment of the rents after the death of her husband. We think she was entitled to receive the rents by virtue of her homestead right in the property. It is true that the well was not drilled until after the death of her husband, but the law is that "a mine lawfully leased to be opened is an open mine within the reason of the rule permitting a life tenant to work open mines." *Koen* v. *Bartlett,* 31 L. R. A. 128; *Poole* v. *Union Trust Company,* 157 N. W. 432, and a long list of cases cited therein to this point.

The payments of rent were made and received before Mandy sold a sixty-three sixty-fourths interest in the oil, gas, and mineral in said land to C. M. Martin. Up to that time she was entitled to receive the rents or production of the soil above or below the surface of the land by virtue of her homestead right therein. *Russell* v. *Berry,* 70 Ark. 317. When Mandy Johnson, however, sold a sixty-three sixty-fourths interest in and to all of the oil, gas, and mineral in, on or under said land, to C. M. Martin, she abandoned her interest therein by virtue of her homestead right as much so as if she had sold a part of the land constituting her homestead, for it was a sale of the body or corpus of a sixty-three sixty-fourths interest in all the oil, gas, and mineral in the land. *Gatlin* v. *Lafon,* 95 Ark. 256; *Felton* v. *Brown,* 102 Ark.

658. Having thus abandoned her homestead right in a
sixty-three sixty-fourths interest in all of the oil, gas, and
mineral in, on or under said land, appellant, as an heir,
became entitled to her interest therein, and to have
Mandy Johnson and C. M. Martin account to her for any
amounts collected by them, as royalties for oil taken from
said lands, belonging to her, since the date of said con-
veyance, less her proportionate part of the mortgage
paid by Martin for her.

On account of the error indicated the decree is
reversed, with directions to enter a decree canceling the
quitclaim deed, and for further proceedings according to
law not inconsistent with this opinion.

McCulloch, C. J., (dissenting). I do not agree with
the conclusion reached by the majority as to the facts in
the case, but it would serve no useful purpose to set forth
the proof in the record upon which my own conclusions
is reached that the finding of the chancery court should
not be disturbed. Suffice it to say that my opinion is
that the finding of the chancellor was not against the pre-
ponderance of the evidence, and that the decree should
for that reason be affirmed.

I dissent from that portion of the opinion of the
majority which holds that the execution of the mineral
deed by Amanda Johnson to appellee Martin constituted
an abandonment of the former's homestead right. It is,
I think, a misapplication of the rule of law which has of-
ten been announced by this court that a conveyance by a
widow of the homestead constitutes an abandonment of
the homestead right, to say that a mineral deed or a sale
of royalties without denuding herself of the occupancy or
surface rights operates as an abandonment. This is an
extension of the rule which is not warranted by anything
said in our former decisions on the subject, but, on the
contrary, is, I think, in hostility to the very reason upon
which the rule is based. The first opinion on this subject
was written by Judge BATTLE in the case of *Garibaldi* v.
*Jones*, 48 Ark 230. In declaring the law as to the right
of the widow to alienate the homestead, he said: "The

law is not concerned about the precise locality of the family at any time, but it is concerned that, wherever they be carried by convenience, chance or misfortune, there shall be a place, a sanctuary, to which they may return to find the shelter, comfort and security of a home. * * * One of the objects of the Constitution is to secure to the widow and orphans the family roof-tree as a fixed home during the widowhood or life of the widow, and minority of the children. It would be clearly against the policy and spirit of the Constitution, in thus providing a home for her, to permit her to alienate it, and to allow others to enjoy the benefits of the homestead of a deceased husband and father, which were only intended for the widow and orphan. If she could do so, the exemption which passes, under the Constitution, to the widow and minor children upon the death of the husband and father, would not be a reservation of a homestead, but a reservation of land of a certain quantity or value, irrespective of its uses."

It is thus seen that the reason upon which the rule is based, that an attempted alienation constitutes an abandonment, is that it deprives a widow of the very thing which is guaranteed to her by the Constitution. The widow has the right, however, to the complete and full enjoyment of the homestead with all of its uses, and by making use of the benefits in any manner short of a conveyance which would deprive her of those uses, she does not abandon that right. The sale of mineral rights with a reservation of royalties is in effect the same as a lease. It does not deprive the widow of any surface rights except those specially granted in order to enjoy the mineral rights, and the right of occupancy is not substantially restricted or cut off. The enjoyment by her of mineral rights is restricted, the same as any life tenant, to wells or mines already opened, and if she goes beyond her rights and attempts to open new wells or mines, she can be restrained by the remainderman, but the attempt to go beyond her rights in that respect does not constitute an abandonment, so long as she does not denude herself of the right of occupancy.

There is still another reason why the execution of the mineral deed by Amanda Johnson should not be treated as an abandonment. The mineral deed was executed after the execution of the deed to her from appellant conveying the title in fee, and, if that deed is set aside, the mineral deed falls with it and should not be treated as an abandonment of the homestead right which the widow had independent of the deed executed to her by appellant. A court of equity, in setting aside the deed executed by appellant and restoring her to her rights, should not grant to her greater rights than she enjoyed before the execution of the deed. To do so is to convert the arm of the court into a sword rather than a shield.

I am in entire accord with the court in holding that the acceptance of rentals by Amanda Johnson after the stipulated date of maturity prevented a forfeiture of the original lease executed by S. L. Johnson to Edwards. The property was the homestead and passed to the widow after the death of the husband. The widow was entitled to the rentals as long as she lived or until she abandoned the homestead, and since the rentals went to her exclusively, she had the right and power to waive the date of payment. She could have exonerated the lessee from paying at all as long as she was in possesson of the homestead, enjoying her rights as widow. It would be otherwise, of course, if the forfeiture was based upon failure to perform some condition made for the benefit of remaindermen and the widow. Where it related to the performance of a condition which inured exclusively to the benefit of the widow, it was in her power to waive the performance of those conditions so long as she was the beneficiary.

The Kentucky case relied on by counsel for appellant (*Jenkins* v. *Williams,* 191 Ky. 229 S. W. 94)    is not directly in point, in that the property involved does not appear to have been the homestead, and the rentals did not become exclusively the property of the widow. The point of that case was whether or not the widow was a

joint obligee so as to have the right to accept rentals at any time or waive the payment thereof. There was a dissenting opinion in the Kentucky case, but we are not concerned with the correctness of the decision. In the present case it is undisputed that the leased property fell to the widow as her homestead after the death of her husband, and that the rentals belonged exclusively to her.

Mr. Justice HART concurs in this dissent.