MRS. MARGARET YOUNGMAN ET AL V.
MRS. ELIZABETH LOVE SHULAR ET AL

No. A-5462. Decided March 14, 1956.
Rehearing overruled April 18, 1956.
(288 S.W. 2d Series 495)

*Patrick J. Horkin, Jr.,* of Corpus Christi, for petitioners.

The Court of Civil Appeals erred in holding that a life tenancy created through the homestead rights of the wife entitled the life tenant to oil royalties, as against remaindermen, from oil wells drilled subsequent to the death of husband, and in holding that the life tenant is entitled to the royalties on oil and gas produced under a lease covering land which was wholly undeveloped for oil and gas at the inception of the life estate. Swyne v. Lone Acre Oil Co. 98 Texas 597, 86 S.W. 740; Tanton v. State National Bank, 125 Texas 16, 79 S.W. 2d 833; Mitchell v. Mitchell, 151 Texas 1, 244 S.W. 2d 803.

*Arnold W. Franklin,* of Jourdanton, and *Williams S. Clarke,* of Houston, for respondents.

MR. JUSTICE CALVERT delivered the opinion of the Court.

The following statement of undisputed facts is taken from the opinion of the Court of Civil Appeals:

"On October 29, 1936, Rem B. Love and Elizabeth Love (now Mrs. Shular) were husband and wife, and on that day executed an oil and gas lease to The Texas Company upon their homestead, consisting of 112.1 acres of land, fully described in the pleadings, and located in Atascosa County, Texas. Afterwards, in May, 1944, Rem B. Love died intestate, leaving as survivors his wife, Elizabeth Love, and five daughters. At the time of Rem B. Love's death no oil wells had been drilled on their homestead, but in 1946 The Texas Company, acting under the above lease, drilled an oil well upon this homestead, and has since that time drilled four more producing oil wells upon the lease. The Texas Company has been paying one-half of the 1/8 royalty provided for in the lease to Elizabeth Love Shular, who still occupies the land as her homestead. The other half of the 1/8 royalty has been paid to Kennedy A. Milburn under an assignment by Rem B. Love and wife, prior to Rem B. Love's death. This assignee is not a party to this suit and his rights are not in question. It was stipulated that the land was either community property or the separate property of Mrs. Shular's deceased husband, Rem B. Love.

"Mrs. Margaret Youngman and two of the other daughters of Rem B. Love and Elizabeth Love, brought this suit for an accounting by The Texas Company, and for a declaratory judgment to the effect that they as remaindermen are entitled to the royalty from these wells allowing Mrs. Elizabeth Love Shular only an interest in the royalty."

The only question to be decided is whether the execution of the oil and gas lease during the lifetime of Rem B. Love requires the court to apply the "open mine" doctrine and award to the surviving widow, whose claim thereto arises out of homestead right, the royalty from wells drilled after her husband's death, or whether such royalty will be preserved for the remaindermen, the widow being awarded only interest thereon.

The trial court applied the "open mine" doctrine and award-

ed the royalties to the widow. That judgment was affirmed by the Court of Civil Appeals. 281 S.W. 2d 373.

In its opinion the Court of Civil Appeals correctly pointed out that the question was one of first impression in this state and that decisions from other jurisdictions in which the question had been considered were unanimous in applying the "open mine" doctrine in this and analagous fact situations. We have reviewed the decisions on the question, many of which are cited in the opinion of the Court of Civil Appeals, and have concluded that they are sound and should be followed by this Court. For example see Koen v. Bartlett, 41 W. Va. 559, 23 S.E. 664, 31 L.R.A. 128; Andrews v. Andrews, 31 Ind. App. 189, 67 N.E. 461; Lawley v. Richardson, 101 Okla. 40, 223 P. 156, 43 A.L.R. 803; Warren v. Martin, 168 Ark. 682, 272 S.W. 367, and "Rights of a Life Tenant" by Clarence A. Guittard, Vol. 4, Texas Bar Journal, 265 (June 1941 issue) where the reasons for the holding may be found. They need not be repeated here.

In determining whether the "open mine" doctrine applies, no distinction is made between a life tenant who holds a conventional life estate and one who holds a legal life estate. Davis v. Bond, 138 Texas 206, 158 S.W. 2d 297. Moreover, in determining whether the doctrine applies, one holding in virtue of a homestead right is regarded as a life tenant. Petrus v. Cage Bros., Texas Civ. App., 128 S.W. 2d 537, writ refused; White v. Blackman, Texas Civ. App., 168 S.W. 2d 531, writ refused, W.O.M.; Clayton v. Canida, Texas Civ. App., 233 S.W. 2d 264, no writ history; Thompson v. Thompson, 149 Texas 632, 236 S.W. 2d 779, 786-788.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered March 14, 1956.

JUSTICE GARWOOD, joined by JUSTICES SMITH and WILSON, dissenting.

To judge by the opinion, as one must, the Court reaches a rather drastic decision concerning the real property law of Texas for the main reason of conforming our law to that of West Virginia, Indiana, Oklahoma and Arkansas and possibly, but not certainly, three or four additional states.

Even assuming that all of the mentioned jurisdictions have decided the exact question before us, which it is not, of course,

stated that they have, still real property law differs notoriously as among the forty-eight states, and since it is universally recognized as being peculiarly local in character, I think we are not at all compelled to adopt a particular rule, that is new to us, merely because the comparatively few jurisdictions which have considered it have all adopted it or something similar to it.

Concededly sound judicial thinking will presume, in the absence of good evidence to the contrary, that a long and generally established rule of property is based on good reason, but this is something quite different from regarding the decisions of a small fraction of the forty-eight states as compelling factors of longevity and universality. Of that fraction, moreover, only a fraction (Oklahoma and Arkansas) appears to have actually considered the double question here involved, to wit, whether to expand the open mine doctrine so as to include a mere lease and to do so in favor of a homestead beneficiary as distinguished from the owner of a conventional life estate. Moreover, of the four decisions named in the opinion of the Court, two involved an actual open mine situation, the controversy being as to additional wells thereafter drilled under the same lease.

Whether we have been right or wrong in heretofore holding that, for the general purposes of the open mine doctrine, there is no difference between the homestead occupancy right and an ordinary life estate in the same premises, the rather extreme consequences of that policy would seem to be a good reason for not extending the doctrine of the open mine in any situation, although one might well be less reluctant to extend it if the extension should be limited to other types of life interest, which obviously under the Court's opinion it will not be. The homestead institution is one imposed by law and, unlike the statutes of descent and distribution, cannot be affected in its operation by the will or other effective expression of the intent of the owner. The authors of the homestead institution probably had in mind largely a place to live and, incidentally thereto, the agricultural or pastoral profits which the occupant would naturally make where the homestead happened to be rural. The small urban homestead carries no special feature of its own which would correspond to the rural homestead crop privilege and thus, being yet a homestead, leaves the inference that security of shelter rather than income was the dominant homestead purpose. The same idea finds still stronger support in the rule that the entire homestead right, including all income privileges, disappears into thin air upon mere abandonment of the

land as a place of abode. The occupant may with impunity abandon exploitation of the land but may not abandon occupancy without losing all homestead rights.

Especially where the homestead is the separate property of the deceased spouse, the latter during life probably thinks of it (as in White v. Blackman cited by the Court) largely as a place of mere occupancy for the other spouse and regards the producing oil wells on it as something apart which may be disposed of by his or her will. Those wells are in many instances his or her only claim to wealth. They may be more than ample in amount to provide eventual well-being for everyone having a claim to the owner's bounty, and without the least inconvenience to the surviving spouse. But the natural outlook or expectations of the owner in this behalf we have heretofore held to be illusory if only production happens to come in before he or she dies. In that case, his or her power over what seemed to be, and in a real sense is, surplus wealth, is severely curtailed. However wealthy the surviving spouse, however abundant the royalties, the latter belong exclusively to the surviving spouse for life, and there is nothing the deceased spouse could have done about it by will. If the surviving spouse has a life expectancy of twenty-five or thirty years, the result is often the same as if she or he were a forced heir of the fee, because the minerals may well be by far the most important element of the fee, and the homestead occupant in effect takes all of the minerals.

On the other hand, a failure to apply the open mine rule would not have left the surviving spouse without benefits. He or she would have still had the occupancy of the land, the crop or pasture revenues and, in addition, the right to have the royalties kept as a trust fund from which she would enjoy the income.

I do not contend for overruling what we have already firmly established. I do say that the result of what we have held is such that we should be slow to extend our holding to new situations which it does not necessarily control.

Whether states such as West Virginia and Indiana which, in the case of conventional life estates, have extended the open mine doctrine to include a mere lease, would have done so in the instance of a homestead right, we do not know. Several of them rest their conclusion on the intent of the landowner, which obviously refers only to cases of conventional life estates and

has no bearing in a homestead case, since the survivor's interest in the latter is created by law. What we now do is to accept their result in life estate cases, then add to it our own previous holding that the homestead right is equivalent to a life estate, and come out with the conclusion that, by the weight of authority, the homestead occupant enjoys the full proceeds of the minerals for life if only the land be under lease when the homestead occupancy of the surviving spouse begins. My own view is that this weight of authority does not weigh very heavily under the circumstances.

Clearly the open mine doctrine is itself an exception to the general rule, and we do not as readily extend established exceptions as we do established general rules. To call a mere lease an "open mine" seems to me quite plainly an extension. Even the cited West Virginia decision, which seems to be the leading American case and involved a conventional life estate, says of it only that it is "within the reason of" the original exception. Certainly there is a substantial difference between an existing producing oil field and a mere lease. The latter naturally presents additional problems.

What if the lease in the instant case had been made much earlier and had expired without production prior to the death of the husband? Will the homestead occupant get all the royalties under a later lease made by her and the other heirs of the husband, so long as her homestead right in the premises persists? Several of the cited cases seem to emphasize that the wells there involved had been drilled under the authority of the husband-landowner, evidenced by his act of leasing. And yet it would seem somewhat pedantic to say that, for the rule we now adopt to apply, the lease has to be one in existence at his death, when he had long previously manifested his intention to exploit the minerals by making the earlier lease. If a mere lease makes the land into an "open mine," what is the difference between an expired lease situation and that of a mine that is open but no longer worked? And what if the lease in existence at the landowner's death should expire without production after his death, and be followed promptly by one with production, in the execution of which the surviving spouse and heirs or devisees of the deceased join?

If we let the actual open mine exception stay as it is, oil men, landowners and the surviving spouses and heirs of the latter will have a fairly clear idea of where they stand. But I believe that when we extend the exception beyond the scope of

its ancient origin and title and call a mere lease an open mine, we risk quite a volume of additional doubt, misunderstanding and hardship without sufficient justification, especially where a party claims the royalties on the basis of the homestead right as in the instant case.

No doubt the authority that could best and most realistically deal with the whole subject, arranging a possibly more equitable and less formalistic relationship between life tenant and remainderman and redefining the interest of the homestead occupant, would be the legislature. See, for example, the Texas Trust Act, Art. 7425b-33, Vernon's Texas Civ. Stats., and comment on the instant case by Robert S. Weatherall in 34 Texas L. Rev., p. 328, 330. Pending such a desirable measure, I think the open mine rule should remain in *statu quo,* especially in homestead cases.

I would reverse the decision below in so far as it recognizes to the respondent title to the royalties solely on the basis of her homestead right.

Opinion delivered March 14, 1956.

Rehearing overruled April 18, 1956.