Reed *v.* Rumph.

Opinion delivered January 11, 1926.

1. EQUITY—ADMINISTERING COMPLETE RELIEF.—Where a complaint invoked the jurisdiction of the chancery court by a prayer for cancellation of a mortgage and declaration of a trust, the court, having acquired jurisdiction, could, if the testimony supported the allegations, grant that relief, and, as incident thereto, decree partition, though defendants asserted an adverse holding.

2. JUDGMENT—RES JUDICATA.—Where plaintiffs in a former suit prayed that a certain conveyance to their sister be treated as a conveyance to her in trust, a decree therein dismissing the complaint for want of equity is *res judicata* in a suit by the same plaintiffs to set aside such conveyance.

3. BROKERS—ACCOUNTING.—Where defendant agreed to dispose of plaintiffs' interest in certain land for a certain commission, and plaintiffs made a quitclaim deed to him as trustee, his relation to plaintiffs called for the exercise of the highest candor and good faith, and, where he did not sufficiently inform plaintiffs of the value of their interest in the land, he would be required to account for the sum received for the land in excess of the agreed commission.

Appeal from Ouachita Chancery Court, Second Division; *George M. LeCroy,* Chancellor; reversed in part.

*D. D. Glover* and *McKay & Smith,* for appellant.

*Gaughan & Sifford, T. W. Hardy* and *Powell, Smead & Knox,* for appellee.

SMITH, J. Appellants, who were the plaintiffs below, allege in their complaint that they, together with their sister Nannie Berry, were the sole heirs-at-law of their mother, Fannie Reed, who died April 2, 1885, and that at the time of their mother's death she owned a 160-acre tract of land in Ouachita County. That Fannie Reed, their mother, had mortgaged this land in 1885 to one D. W. Chandler to secure advances to be made by said Chandler to enable Fannie Reed to make a crop in the year 1885, and upon the security of this mortgage Chandler made advances to Fannie Reed amounting to $51.82. That Fannie Reed died before the crop was gathered, and it was agreed between these appellants and their sister Nannie Berry that this sister should remain

in possession of the land and out of the proceeds of the crop should pay Chandler the indebtedness secured by the mortgage to him.  That this was done and the indebtedness fully paid, and that, pursuant to this agreement in regard to the possession, Nannie Berry continued to occupy the land after the death of Fannie Reed, it being understood that Nannie Berry should occupy and cultivate the land and keep the taxes paid, her possession being for the benefit of herself and her tenants in common, to-wit, her brother and two sisters, who were the plaintiffs below and are the appellants here.  That Nannie Berry made a crop on the land in 1886, and obtained advances to enable her to do so from Chandler in the sum of $82.  That this debt of $82 was the personal obligation of Nannie Berry, and was not secured by the mortgage which her mother had executed the previous year, but it was alleged that this debt of $82 was fully paid, and that nothing was due Chandler on account of advances for either 1885 or 1886.

It was further alleged that, notwithstanding the fact that nothing was due under the mortgage, one J. C. Russell, in 1892, applied for and secured letters of administration on the estate of Fannie Reed, and thereafter the claim of Chandler for $82 was probated against the estate, and the land was sold in satisfaction of this demand.

Various irregularities in this sale are alleged; in fact, a conspiracy is charged between Chandler and Nannie Berry to procure the sale of the land.  Chandler became the purchaser at the administrator's sale, which was confirmed, and, after cutting the timber off the land, Chandler conveyed it to Nannie Berry by a quitclaim deed.  The administrator's deed was dated August 2, 1895, and the deed from Chandler to Nannie Berry was executed February 11, 1904.

We do not review the testimony tending to establish the allegations of the complaint in which it was prayed that this deed from Chandler to Nannie Berry be can-

celed, for the reason that it appears that the plaintiffs here were the plaintiffs in a former suit, which was decided adversely to them and is conclusive of the question.

Nannie Berry died in 1910, and was survived by an only child, a daughter named Parthenia, who had married one Arthur Sewell, and to this union two children were born, one a son named A. W., the other a son named John W. Sewell. These children are minors, and their mother Parthenia is dead.

In 1911 plaintiffs here brought suit to recover an undivided three-fourths interest in the land, and partition thereof was prayed. This complaint recited the ownership of the land by Fannie Reed, the execution and payment of the mortgage hereinbefore referred to, the fraudulent appointment of an administrator of her estate, the probate of a demand against her estate which she did not owe and which had been paid by the person who did owe it, the irregularity of the appraisement, the inadequacy of the price at which the land was sold by the administrator, and the collusion between Nannie Berry and Chandler by which the sale was effected. This complaint prayed that the deed to Nannie Berry from Chandler should be treated as a conveyance to her as trustee for the benefit of herself and her tenants in common, the plaintiffs here, who were the plaintiffs there.

Upon these allegations the court was asked to appoint a commissioner to state an account as to the rents, etc., and that the mortgage executed by Fannie Reed be canceled and held for naught, and that Nannie Berry be declared a trustee under the deed to her from Chandler, and that partition of the land be decreed.

The depositions in that case were lost, but the pleadings were produced and offered in evidence at the trial from which the present appeal comes, and it appears from the answer filed in that case that issue was joined as to all the allegations of the complaint, and the answer alleged that title was claimed under the administrator's deed and also by virtue of the more than seven years'

possession by Chandler after receiving the administrator's deed before conveying the land to Nannie Berry. An attorney who participated in the trial of that cause testified that a day of the court was consumed in the trial. At the conclusion of that trial a decree was entered dismissing the complaint as being without equity. This decree was offered in evidence, and it is therein recited that the cause was heard on the pleadings and exhibits, the depositions of witnesses and documentary evidence, from all of which the court found "that the complaint of plaintiffs should be dismissed for want of equity and as not established by the proof introduced in said cause."

Upon this finding of fact it was there decreed "that the plaintiffs take nothing herein by virtue of their complaint, and that the same be and is hereby dismissed for want of equity, and as having not been established by the proof." Upon this record the defendants herein entered a plea of *res judicata.*

Appellants now say this plea is unavailing, as nothing more was there adjudged than that the complaint was without equity, and that this finding resulted from the fact that the defendants were in the actual possession of the land and had alleged a title adverse to the plaintiffs, and upon this finding nothing remained for the chancery court to do but to dismiss the cause and remit the plaintiffs to their action at law.

We do not, however, so understand the effect of the decree. The cause was not transferred to the law docket, as it might and should have been if the chancery court had found only that there was an adverse holding of the land which presented an issue triable at law.

The complaint prayed equitable relief by way of the cancellation of the mortgage, and the declaration of an existing trust, and, if the court had found that the testimony sustained the allegations raising these issues, the equitable relief prayed could have been granted as an incident thereto, and partition could also have been ordered.

The chancery court had jurisdiction for this purpose, and that jurisdiction was invoked by the plaintiff, and, having acquired this jurisdiction, partition could have been decreed, had the testimony supported the allegations of the complaint, although defendants asserted an adverse holding. *Trapnall* v. *Hill*, 31 Ark. 345; *Moore* v. *Gordon*, 44 Ark. 334; *Criscoe* v. *Hambrick*, 47 Ark. 235; *Hawkins* v. *Layne*, 48 Ark. 544; *Cannon* v. *Stevens*, 88 Ark. 610.

The case of *Wheeler* v. *Bennett*, 79 Ark. 210, sustains the plea of *res judicata* in the present case. That was a suit brought to vacate a decree of the chancery court, in which it was recited that the defendants had been constructively summoned but had made default, and a decree of partition had been rendered and the report of the commissioners making partition confirmed. Suit was brought to set this decree aside, and it was alleged in the complaint praying that relief that the party asking it was not served with summons, did not appear in the suit, and had no information of the pendency thereof until after the rendition of the decree. The defendants in the suit to vacate the prior decree alleged, among other defenses, that the plaintiffs had, at a former term of court, instituted the same action, in the same court, setting forth the same cause of action, and seeking the same relief, and that the court had rendered a final decree, upon the pleadings and proof, dismissing the complaint for want of equity. This decree was pleaded in bar of that suit.

The decree pleaded in bar of the suit recited that: "This cause is heard upon the pleadings, affidavit of plaintiff and the record of decree and report of partition in the case of *Bennett* v. *Bugg*, * * * and, upon consideration, the court finds that there is no equity in the plaintiff's complaint," and upon this finding the cause was dismissed. The court then said: "It is urged in behalf of appellant that the decree in the former suit was in effect a nonsuit or dismissal for want of prosecu-

tion, and was therefore without prejudice to another suit upon the same cause of action. The recitals of the decree do not sustain that contention. It appears therefrom that the cause was heard by the court 'upon the pleadings and affidavit of plaintiff and the record of decree,' etc., and that upon consideration the court found no equity in the complaint, and dismissed it. The defendants in that suit (appellees Bennett and Lollar) were constructively summoned, and made no appearance; so, notwithstanding the default, appellant was required by law to prove his cause of action against them. Kirby's Digest, § 6253. The court found the proof to be insufficient to sustain the allegations of the complaint, and dismissed it. That decree was not appealed from or set aside, so far as this record discloses, and therefore barred appellant from prosecuting another suit upon the same cause of action."

We conclude therefore that the decree rendered in the former case is conclusive of the issues raised in the present case, as the former decree was never appealed from or set aside, and has become final.

There was a branch of this case which was heard and disposed of along with the main case which we next proceed to consider. It was alleged that the plaintiffs had employed G. S. Rumph to dispose of their interests in the land, and that Rumph had disposed of their interest without properly accounting to them for the proceeds which had been derived from the sale of the land. Oil had been discovered in the vicinity of the land here in litigation, and Rumph was speculating in oil leases. He discovered that these plaintiffs apparently owned an interest in the land, and he wrote the appellant George Reed the following letter:

"I have been working for sometime to try and get the Berry lands straight, but have had a pretty hard time. A man in Chicago has been paying the taxes on some. Now, George, I am sending you an option to sign to me an oil and gas lease, so I can try and sell same, but before I can do much with it I will have to get

abstract and see if you and your sister actually own any interest in same. Please let me know what the man in Chicago name is and see what rights he has. Now, George, this option on the oil and gas lease is, if I can get anything out of it for you, I get a commission of ten per cent., and you all that own the land will get the balance. Some claim you and your sister have no interest in same at all, but that will come out whenever the abstract is made. If your wife is up there, have her sign with you before a notary public and send back to me, and I will have your sister sign.

"Now whatever I get, if anything, I will give all to you after taking out for the abstract and ten per cent. commission. If it shows up you all have no interest, I will be out what I spend on it, and the man in Chicago will get it or whoever the legal heirs are. Attend to this at once, so I can get same finished up. I have about three hundred acres in that part of the country, and, if possible, I am going to try to get some man to take it all; if not, I will do the best I can as I promised you."

Rumph caused an abstract of the title to the land to be prepared at his own expense, which was submitted to an attorney, who, after examining the abstract, expressed the opinion that appellant Reed and his sisters—Reed's coappellants here—could recover an undivided three-fourths interest in the land. This abstract had omitted the record of the decree in the former case which we have just discussed, and upon discovering this decree the attorney then advised Rumph and appellant Reed that this decree would bar a second suit.

Rumph testified that, pending the examination of the abstract by the attorney, and prior to the discovery of the omitted decree, he had agreed on behalf of appellants that the attorneys in the case should have as their fee, in the event the land was recovered, an undivided half interest in the recovery, and that Rumph and the three appellants should divide the remaining half interest

equally. The attorneys with whom this agreement was made did not file the present suit.

Rumph also testified that, after being advised that appellants could not recover any interest in the land, he was importuned by appellant Reed to pay him something for himself and his sisters to secure a release of their interest in the land, but witness declined to do so for the reason that he did not know that he would be able to secure anything for a quitclaim deed. He admitted that appellants had previously conveyed their interest in the land to him as trustee, but he testified that this was done to protect himself and the attorney in the event the land was recovered, so that he could make a division of the proceeds of the recovery. Rumph further testified that Reed was so importunate that he and his sisters be paid something that he finally agreed to pay Reed $150 and his sisters $50 each in full acquittance of any claim they might have for any part of the money which he might obtain for a quitclaim deed to the purchasers of the land from the Sewell heirs, and that, pursuant to this agreement, he paid those amounts and took receipts therefor, which he offered in evidence, and that, when this payment was made, he was taking the chance of losing the sums thus paid as well as the cost of the abstract, as he did not then know that he would ever receive anything for his deed.

The court below accepted Rumph's version of this transaction and dismissed the suit against Rumph for the sum received by him for his quitclaim deed. It is admitted that Rumph received in cash and in oil $4,500 for his quitclaim deed.

This part of the decree is, we think, against the clear preponderance of the evidence. The letter we have set out above is unmistakable in its meaning and reserves to Rumph only ten per cent. of such sum as might be recovered through his efforts. The deed from appellants to Rumph was made to him, not individually, but as trustee, and we think the purpose of the trust should be

decreed to be to effectuate the agreement contained in the letter.

It is true, nothing was conveyed by the quitclaim deed, as appellants owned no interest in the land, but there was involved in the sale of the lease a large sum of money, about $70,000, and the purchaser was unwilling to accept the lease until the deed from appellants to Rumph was out of the way, and this objection to the title was disposed of by buying from Rumph as trustee a quitclaim deed, and for this deed the sum of $4,500 was paid.

The receipts to Rumph above referred to recite that the sum paid was "in full settlement for and satisfaction of all demands of any character or kind whatever against him for and in consideration of the deed executed to him for my interest" in the lands here involved. This receipt was dated October 7, 1922, whereas the quitclaim deed from Rumph as trustee to the purchasers of the oil lease was dated October 2, and was then in escrow awaiting the approval by the probate court of the lease from the guardian of the minor Sewell children.

The testimony shows that the exact sum to be paid Rumph had not then been agreed upon, and was finally definitely fixed after receipts had been executed. But the relation between Rumph and appellants was one calling for the exercise of the highest candor and good faith, and we do not think he sufficiently disclosed to them the probable value of his quitclaim deed. On the contrary, he admits telling Reed that appellants had no valuable interest in the land, and he also testified that the sum paid him was virtually a gift.

Under the facts of the case we think this speculation of Rumph was not one to be approved, and that he should be required to settle with appellants, the beneficiaries under the trust deed, which was without consideration except that expressed in the letter from Rumph to Reed. *Myers* v. *Linebarger*, 134 Ark. 231.

The decree of the lower court below, therefore, will be affirmed, except in so far as it relates to Rumph, and as

to him it will be reversed, and, as the cause appears to have been fully developed, it is here ordered that Rumph be allowed a credit of $450 as commissions and the amounts evidenced in the receipts, and that appellants have judgment against him for the balance.

SMITH, J., (on rehearing). It is insisted in the brief filed in support of the petition for rehearing that there was nothing about the transaction which Rumph could have told the Reed heirs before paying them the $250 and taking receipts from them, and that at the time the deed was delivered to the Sewell heirs Rumph was operating under an agreement, not for a mere ten per cent. commission, but one whereby the attorneys in the case were to have one-half of any amount received, the other half to be divided equally between the Reed heirs and Rumph.

An undisputed fact in the case is that, at the time the deed from the Reed heirs to Rumph was executed, nothing was paid by way of consideration, and the deed was made, not to Rumph as an individual, but to him as trustee. The deed from Rumph, as trustee, to the Sewell heirs was executed and placed in escrow on October 2, and one of the attorneys for Rumph on this appeal testified that "a deed was prepared and executed by Rumph to meet that requirement (that the claim of the Reed heirs be disposed of) and held in escrow with the lease which had been made by Sewell and by Sewell as guardian for the two minor children." The attorney representing the purchaser of the lease had made the requirement that a quitclaim deed from Rumph as trustee be secured before the transaction was closed and the money involved ($70,000) paid to Sewell as guardian.

The sum which Rumph would receive had not then been agreed upon, yet Rumph admitted that he did not tell the Reed heirs of this requirement and that this quitclaim deed from him had been placed in escrow, and while they were in ignorance of these facts he obtained acquittances from the Reed heirs by paying George Reed $150 and the two sisters of Reed $50 each.

It is also insisted in the brief in support of the motion for rehearing that Rumph has already paid the attorneys in the case one-half of the consideration received by him for his quitclaim deed, and that he should therefore be required to account to the Reed heirs for only one-half of the remaining one-half, or one-fourth of the total consideration received.

The case was tried in the court below on the theory that Rumph had purchased this property from the beneficiaries of the trust, and that he was under no duty to account to them for any part of the profit which he made. The position now taken, that Rumph should account for only one-fourth of the consideration received, is therefore an inconsistent one. Moreover, Rumph did not claim or testify that he had ever stated to either of the two sisters of George Reed that he was acting otherwise than under his proposition to charge ten per cent. of any recovery he might secure. In his cross-examination Rumph was asked this question: "Did you have a conversation with the other heirs, Millie Weaver and Mollie Gaskin, besides George Reed, after you wrote them this proposition of handling this for ten per cent., and you say he came about fifteen days after you wrote this letter—did you go then and have a conversation with those women about it?" and he answered, "No sir."

The attorney representing Rumph did not testify that he was ever employed by Reed in any manner. The attorneys in the case all testified that, when the decree in the first case referred to in the original opinion was discovered, they gave the case up, after advising Rumph that the land could not be recovered. There was therefore no recovery under the contract of employment of the attorneys by Rumph, even though Rumph had had the authority to make such a contract.

Such sum as was recovered was paid after the attorneys had advised Rumph that nothing could be recovered, and after Rumph, according to his own admission, had advised George Reed that nothing could be recovered, and after Rumph had refused to pay anything for the

title which he later conveyed until, as he testified, he knew what he was going to get for his quitclaim deed. Now, while the testimony does show that Rumph did not know what he would receive for his quitclaim deed, he knew that any sum he might receive would be paid for the quitclaim deed to the land for which he had paid nothing when it was executed and delivered to him as trustee. Yet, after representing to the Reed heirs that "their claim was no good," he obtained their receipts without advising them that he had executed a quitclaim deed as trustee, which was then in escrow to be delivered when a satisfactory price was offered him for this deed.

We conclude therefore that there is no error in requiring Rumph to settle with the beneficiaries of the trust pursuant to the contract whereby he became trustee for them, and the motion for a rehearing is therefore overruled.

Chief Justice McCULLOCH and HART, J., dissent.

### DISSENTING OPINION.

McCULLOCH, C. J. I differed widely with the majority as to the effect of the testimony in this case, but I did not record my dissent from the original opinion for the reason that nothing is gained by expressing a dissent on a mere question of fact. However, the court has, in an additional opinion on rehearing, expressed views which in effect relate to questions of law, therefore I feel justified in recording my dissent at this time.

I think that the conclusions of the court upon all the questions relating to the liability of appellee Rumph are against the clear preponderance of the evidence. In the first place, there is no evidence that the alleged option between Reed and Rumph to sell the land on a commission basis of ten per centum ever became effective. The negotiations which led up to the preparation of the option contract were at a time when it was thought that the appellants, Reed heirs, had title to the land, and Rumph was to serve merely as sales agent. It was later discovered that the Reed heirs had no title. The option contract was never signed by the parties and never became

effective, but, on the contrary, Reed and Rumph entered into a new agreement whereby Rumph was to employ attorneys to look after the interests of the Reed heirs and divide the proceeds of any settlement with adverse claimants on the basis that the attorneys were to receive one-half and Rumph and the Reed heirs should divide the other half. The testimony on this subject was conflicting, but the decree of the chancellor was based upon the testimony of Mr. Smead, the attorney, and Rumph, on the one hand, as against George Reed alone on the other hand. The conclusion of the majority is based upon the unsupported testimony of Reed as against that of both Smead and Rumph.

In the next place, the court is giving too much effect to the failure of Rumph to mention to the Reed heirs the fact that he had executed a quitclaim deed to the Sewell heirs and placed it in escrow. It is undisputed that, at the time this deed was executed and left with Mr. Gaughan, there was no agreement whatever for a settlement, and the deed was not placed strictly in escrow, for there was no consideration agreed upon and no one had the absolute right to deliver the deed to the grantees. The deed was executed merely for the purpose of having it ready if it was found that a payment of some amount could be secured from the prospective purchaser. Now, there was nothing at that time for Rumph to disclose to the Reed heirs further than the bare fact that, in an effort to secure a price for the heirs, he had executed a quitclaim deed merely for the purpose of having it ready in the event a satisfactory deal could be made. According to the testimony in the case, Reed and the other heirs knew at that time that Rumph was engaged in an effort to find some one who would pay something to buy peace from the Reed heirs. All that Rumph could have disclosed to the Reed heirs would have been the bare fact of the execution of the deed, and there was nothing in addition to that over and above the facts which the Reed heirs already knew. The agreement for the price came suddenly and unexpectedly at an opportune moment when

the purchasers from the Sewell heirs were anxious to close the deal and were willing to pay the disproportionate price of $4,500 to remove a cloud on the title caused by the execution of the deed to Rumph as trustee. The only circumstance which the majority find in justification for setting aside the settlement between the Reed heirs and Rumph is that he failed to tell them about this deed, and it seems to me that that fact is very far from showing a failure on the part of Rumph to disclose material information which might have affected the settlement.

The error of law which I think the majority has fallen into is in holding Rumph liable for the whole of the amount collected by him, even if it be held that the settlement between Rumph and the Reed heirs should be set aside because of his failure to disclose the fact about his having previously executed a quitclaim deed to the Sewells. If, as the preponderance of the evidence shows, the last agreement between Rumph and Reed was that attorneys should be employed and given half of the proceeds, then the setting aside of the settlement between Rumph and the Reed heirs should not enlarge their rights above the stipulations of the contract. In other words, if the court finds justification in setting aside that last settlement, the rights of the parties are still dependent upon the terms of the contract. I perceive no reason why a court of equity should declare a forfeiture of the rights of Rumph under the contract. It is undisputed that he received a price largely in excess of anything that was expected after it was discovered that the Reed heirs in fact had no title. According to the preponderance of the testimony, Rumph was authorized to employ the attorney, and it is not just that Rumph should be required to lose the amount paid to the attorney out of the price received. In any view of the case, it seems to me that complete justice would be done by giving to the Reed heirs all that they would have obtained under the contract, less the amount which they received from Rumph in the original settlement.

I am authorized to say that Mr. Justice HART agrees with me in the expression of these views.