TROUT *v.* HARRELL.

4-9235                                         233 S. W. 2d 233

Opinion delivered October 9, 1950.

Rehearing denied November 13, 1950.

*Abbott & Abbott,* for appellant.

*Mahony & Yocum,* for appellee.

ED. F. McFADDIN, Justice. Appellant, as plaintiff, filed this suit in Chancery Court to cancel a deed which she alleged was obtained from her by the fraud of her stepson, Ross Harrell, who is one of the appellees. The trial court refused the relief sought; and this appeal seeks a reversal of the Chancery decree.

Jesse Harrell, the father of the appellee, Ross Harrell, married the appellant, Mrs. Inez Harrell (now Trout), in 1931; and they lived together until Jesse Harrell's death in 1940. Ross Harrell (now 39 years old) lived in the home of his father and stepmother during their married life, and continued to live in the home of his stepmother for some time after the death of his father. Jesse Harrell, as one of the children of Ben Harrell (who died in 1926), owned an undivided interest

in 140 acres in Union County known as the Ben Harrell Estate. Appellant, Mrs. Inez Harrell (now Trout), was entitled to dower in the Jesse Harrell interest; and also she purchased in her own right the interest of some of the heirs in the Ben Harrell land. Also, Jesse Harrell, and his brother, Lige Harrell, owned 90 acres, as tenants in common; and appellant had a dower interest in this land. No part of the 230 acres was in cultivation. At one time after the death of Jesse Harrell the timber was sold from some of the lands; and Lige Harrell and Ross Harrell gave the appellant what they said was her part of the proceeds of the timber money. In 1944 the appellant remarried and is now Mrs. Inez Harrell Trout, and lives in El Dorado, Arkansas, in which City occurred the negotiations and transactions hereinafter to be mentioned.

In October, 1948, Mr. Weadock (an oil scout) approached Lige Harrell, uncle of Ross Harrell, about an oil and gas lease on the 230 acres; and Lige Harrell informed Weadock that he would not take less than $25 an acre for a lease on his part of the lands. This price did not deter Weadock; and he obtained a list of the other parties interested in the Harrell lands, and on subsequent occasions revisited Lige Harrell, who was the "moving spirit" in the leasing of the Harrell lands. Ross Harrell lived in Bixby, Oklahoma, and Lige Harrell contacted him by phone and letter.

Ross Harrell had been trying for several years to purchase all of the interest of Mrs. Trout in the 230 acres; and, motivated by the prospects of leasing the lands for oil and gas, as told him by his uncle, Lige Harrell, Ross Harrell left his home in Bixby, Oklahoma, and arrived in El Dorado, Arkansas, on November 10, 1948. He visited with his relatives, and with Mrs. Trout; and on November 12, 1948, he persuaded Mrs. Trout to sign a warranty deed to him for all of her interest in all of the 230 acres. He paid her $820 in cash and agreed that he and his wife would execute to Mrs. Trout a non-participating royalty deed, conveying to her 28/69ths of the royalty under 18 2/3 acres of the Harrell lands. Mrs. Trout's deed to

Ross Harrell was placed in escrow until Ross Harrell and wife should execute the royalty deed.

A few hours after Mrs. Trout had signed the warranty deed to Ross Harrell, he sold to Weadock an oil and gas lease on the purchased property for as much as he had paid Mrs. Trout for the deed for her entire interest in the lands. Before the royalty deed was actually signed and before Mrs. Trout's deed was taken from escrow, she filed this suit to cancel and rescind her deed to Ross Harrell on the ground that it had been obtained from her by fraud. The evidence as to the fraud consists, *inter alia,* in the fact that Mrs. Trout inquired of Ross Harrell, before she executed the deed, as to whether there had been any offers to lease the land for oil and gas; and he told her there had been no such offers, when in fact he knew that there had been such offers and that he had come to El Dorado for such purpose.

The law is well settled that when parties are *sui juris* and deal at ''arm's length'' and in no confidential relationship, the prospective purchaser is under no obligation to volunteer information to the vendor; but if in such a situation, the vendor makes inquiry of material matters and the purchaser undertakes to make answers, then such answers must be truthful, unequivocal and non-evasive. The rationale of the holdings is summarized in 23 Am. Jur. 860:

''Response to Inquiries.—A party of whom inquiry is made concerning the facts involved in a transaction must not, according to well-settled principles, conceal or fail to disclose any pertinent or material information in replying thereto, else he will be chargeable with fraud. The reason for the rule is simple and precise. Where one responds to an inquiry, it is his duty to impart correct information. Thus, one who responds to an inquiry is guilty of fraud if he denies all knowledge of a fact which he knows to exist, if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth. . . .''

In 56 A. L. R. 429 there is an Annotation entitled: "Duty of purchaser of real property to disclose to the vendor facts or prospects affecting the value of the property"; and on page 434 thereof the effect of the cases is stated in this language:

"So, while recognizing that the prospective purchaser would not ordinarily owe the vendor the positive duty to inform the latter as to facts or conditions affecting the value of the land, in the absence of exceptional circumstances, the courts have widely held that there are other circumstances not involving a fiduciary relationship, under which the vendor may have the right to rely upon the prospective purchaser telling the entire truth with respect to facts and conditions bearing upon such value; . . . Under such circumstances it becomes the purchaser's duty to speak the truth, if he undertakes to speak at all, and a concealment or suppression of the truth, where coupled with any actual misrepresentation or over-reaching, however slight, may be sufficient to entitle the vendor to have the deed set aside, the circumstances amounting to fraud or deceit."

Among the scores of cases cited to sustain the summarized statements, there is our own case of *Warren* v. *Martin,* 168 Ark. 682, 272 S. W. 367. In that case the purchaser undertook to inform the vendor of the conditions regarding oil development and misrepresented such conditions. This Court, after reviewing all of the evidence, directed that the deed so received by the purchaser should be cancelled; and we said: "We are convinced by a preponderance of the evidence that appellant (vendor) was induced to execute the deed through misrepresentation on which she had a right to, and did, rely." Likewise, in *Danielson* v. *Skidmore,* 125 Ark. 572, 189 S. W. 57, the vendor made inquiry of the vendee concerning the condition of property about to be received as part purchase price; and the vendee made answers which were material and which he knew to be false. In awarding relief to the vendor, we said: "He had a right to rely upon the representations of Danielson as to the quality of

the soil, and according to his testimony he did rely upon them.''

The preponderance of the evidence clearly establishes that Ross Harrell, in obtaining Mrs. Trout's signature to the deed, violated the salutary rules just stated. Here is his testimony:

''. . . My Uncle Lige told me over the phone that they were leasing land around Lisbon, and if I would come down I would have a chance to lease. That was two or three weeks prior to the time I came. I told him I would come down on the 10th or 12th (November) . . .''. Regarding his answers to Mrs. Trout's inquiries on November 11th, he testified:

''Q. Was anything said about you having had an offer for the lease on the land? A. She wanted to know if I had had an offer for the lease on the land, and I said I had not, and then she asked if any member of the family had had an offer on the land, and I said not so far as I knew. Q. Had you had any? A. No. Q. Had any of the family, so far as you knew, had an offer? A. I didn't know if they had.''

Thus Ross Harrell admitted that he told Mrs. Trout absolutely nothing about the Weadock negotiations, although he knew of them. He claims that she asked him about ''offers to lease''; and that all of which he had *actual knowledge* were mere ''chances to lease''. We hold that when he elected to answer her inquiries, then he should have told her of the Weadock negotiations of which he had knowledge and which had caused his trip to El Dorado at that time.

To say the least of it, his testimony and that of his witnesses shows that Ross Harrell was evasive, equivocal, and misleading, in the answers he gave to Mrs. Trout in response to her said inquiry. Both Ross Harrell and Lige Harrell, his uncle, testified that Lige Harrell was looking after all lease matters for Ross Harrell and the other Harrell heirs. Lige Harrell denied that Weadock ever made him a real ''offer'' until about an hour *after* Mrs. Trout had signed the deed. But at one place in

the testimony Lige Harrell said of his letter to Ross Harrell:

"A. I wrote him and told him that some leases were being sold in that community. Q. You didn't write him that Weadock was trying to buy his lease? A. *I told him that we had had offers.*" (Italics our own.)

Furthermore, on November *10th,* Weadock had his attorneys in Magnolia prepare the proposed deed from Mrs. Trout to Ross Harrell, and also the oil and gas leases for the Harrell heirs to execute. Weadock stayed in El Dorado and never contacted Mrs. Trout. About noon of November 11th, Lige Harrell told Weadock that Mrs. Trout had just agreed to sign the deed to Ross Harrell; and Weadock then handed the previously prepared deed to Lige Harrell who took it to the office at which Ross Harrell had advised Mrs. Trout to meet him. The deed was actually signed by Mrs. Trout at about 3:00 P. M. and at about 4:00 P. M. Ross Harrell, Lige Harrell, and some of the other Harrell heirs signed the lease to Weadock.

We would certainly be over credulous were we to believe that Ross Harrell came from Oklahoma to El Dorado and visited with his uncle and aunt during the night and day of November 10th and did not learn from them all about the Weadock-Harrell negotiations, and that Weadock had continued to seek the lease after Lige Harrell had quoted the price of $25 per acre. The preponderance of the evidence establishes that Ross Harrell did know of the Weadock offers when he gave his answers to Mrs. Trout. What happened, as shown by the entire record—of which we have mentioned only a small part—"speaks so loud" that we cannot believe the feeble explanations offered by Ross Harrell and his witnesses in their attempt to establish that the answers given to Mrs. Trout's inquiries were truthful, unequivocal and non-evasive.

Appellees claim that Mrs. Trout did not in fact rely on the answers that Ross Harrell gave her. We are convinced, however, by the preponderance of the evidence

that Mrs. Trout did rely on Ross Harrell's answer. The mere relationship of stepmother and stepson does not, *ipso facto,* create a confidential relationship between the parties. See *Smith* v. *Lamb,* 87 Ark. 344, 112 S. W. 884. Likewise, the mere relationship of co-tenancy does not, *ipso facto,* create a confidential relationship in all the dealings between the parties, even though such a relationship may exist in some matters. See *Clements* v. *Cates,* 49 Ark. 242, 4 S. W. 776. We are not deciding the present case on any theory of confidential relationship. We are mentioning these matters to show that in the timber dealings between the parties Mrs. Trout did in fact rely on Ross Harrell; and that, likewise, in this deed matter she did rely on the answers made by Ross Harrell to her inquiry; and she is entitled to rescind the transaction because such answers lacked that truth, candor and non-evasiveness which are essential.

The decree is reversed and the cause is remanded, with directions to enter a decree in accordance with this opinion upon Mrs. Trout's return of the $820 she received from Ross Harrell.

GRIFFIN SMITH, C. J., dissents.

GRIFFIN SMITH, C. J. My conclusion is that Mrs. Trout did not rely upon representations made by Harrell; that she had personal knowledge of values, and that her contracts were not predicated upon information obtained from her stepson. Effect would be to affirm the Chancellor's findings. The case was heard by one of the State's most capable judges of equitable matters who invariably gives attention to every material issue. I do not think the testimony is sufficient to overturn his findings.