**CONSOLIDATED OIL & GAS, INC.,**
a Corporation, Plaintiff,

v.

**Dorsey M. RYAN, Defendant.**

**Civ. A. No. 1929.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Jan. 5, 1966.

On Motion for New Trial Feb. 16, 1966.

Hardin, Barton, Hardin & Jesson, Fort Smith, Ark., Sam McClaren, Denver, Colo., for plaintiff.

Warner, Warner, Ragon & Smith, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

In this action commenced July 27, 1965, plaintiff seeks to recover the sum of $20,171.24 and an assignment of a 1 percent overriding royalty interest because of an alleged fraud practiced upon it by the defendant. The plaintiff, Consolidated Oil & Gas, Inc., is a Colorado corporation with its principal place of business in the City of Denver, and is engaged in the business of exploration and development of oil and gas properties in various places and states, including Arkansas. The defendant, Dorsey M. Ryan, a geologist, is a citizen of the State of Arkansas and a resident of Fort Smith. Jurisdiction exists by reason of diversity of citizenship of the parties and the amount in controversy, 28 U.S.C.A. § 1332(a), (1964 Supp.).

The plaintiff in its complaint alleged that it had in the past two or three years employed the defendant in his capacity as a geologist. It is further alleged that on May 24, 1965, defendant called the plaintiff by telephone and represented that he, Ryan, owned substantial acreage in Township 4 North, Range 31 West, Sebastian County, Arkansas, and that he had offered the acreage for sale but had been unable to procure a buyer. He knew that the plaintiff had acreage in the vicinity and evidenced a desire to purchase the acreage so he could combine it with his own and make it more attractive to potential purchasers in the area. It is further alleged that the plaintiff specifically inquired of the defendant as to whether there had been any show of gas in a certain well being drilled in the vicinity by the Midwest Oil Corporation known as "Acme No. 1," and in reply thereto the defendant stated and represented that there had been a small show of gas but that it was of no significance.

In the complaint it is further alleged:

" * * * Defendant knew that said representations were material and were made by him to the plaintiff with the intent that plaintiff would rely thereon, and that because of plaintiff's and defendant's prior relationship of trust and confidence, plaintiff was entitled to rely thereon. In addition thereto, the plaintiff inquired of the defendant as to the fair market value of oil and gas leasehold acreage in the vicinity of plaintiff's and defendant's leasehold interests. Defendant advised plaintiff that he was attempting to sell his acreage for $3.00 per acre, and that if he had both his acreage together with plaintiff's acreage, he would be able to sell the combined acreage for approximately $3.00 per acre. Defendant was insistent upon receiving reply as to plaintiff's willingness to sell said interest to him and plaintiff consented and agreed to sell the lease to the defendant in reliance upon defendant's material representations for the sum and amount of $3.00 per acre and the reservation of an overriding royalty interest of 2%.

"VII.

"Plaintiff, relying upon the representations made by the defendant, did proceed to execute its assignment of the oil and gas lease in question on the 25th day of May, 1965 to the defendant; and that attached hereto, marked Exhibit 'D', and by this reference made a part hereof, is a true and correct copy of such assignment; that same was duly posted in the United States Postal Service to the defendant; that unknown to plaintiff at the time of defendant's representations to the plaintiff aforesaid, but well known to the defendant, the Midwest Oil Corporation gas well which was being drilled aforesaid, had a substantial show of gas with a flow of approximately eight million (8,000,000) cubic feet per day, and that leasehold acreage in the vicinity had a substantial val-

ue over and above $3.00 per acre; that the defendant did, on or about the 25th day of May, 1965, offer for sale said leasehold interest purchased from the plaintiff for $20.00 per acre, and on or about the same date did accept a counter offer of $17.50 per acre and a 1% overriding royalty interest and immediately upon receipt of said leasehold acreage the defendant in turn assigned same to the person who purchased from him and received a profit of $14.50 per acre and a 1% overriding royalty interest as a result thereof; thus, because of the defendant's representations and the fraud practiced upon plaintiff, the defendant unjustly enriched himself in the sum and amount of $20,171.24 and a 1% overriding royalty interest and that the plaintiff accordingly has been damaged in said sum and amount and interest, since the market value of said lease acreage was not $3.00 per acre as represented by defendant to plaintiff, but in fact had a fair market value of at least $17.50 per acre. Plaintiff is accordingly entitled to Judgment against the defendant for the sum and amount of $20,171.24 and an assignment of defendant's one percent (1%) overriding royalty interest."

The defendant in his answer of August 10, 1965, denied generally every material allegation in the complaint and prayed that the complaint be dismissed and that plaintiff take nothing.

On December 9, 1965, the case was tried to the court without the intervention of a jury, and at the conclusion thereof was submitted subject to the receipt of briefs by the parties. The briefs in support of the parties' respective contentions have been received and considered along with all the evidence adduced at the trial, and this opinion, containing the findings of fact and conclusions of law, is filed as authorized by Rule 52(a), Fed.R.Civ.P.

The defendant, Ryan, was initially contacted by the plaintiff, Consolidated Oil & Gas, Inc., in April 1963. The defendant, as a consulting geologist, had been recommended to plaintiff to do some evaluation work in the western Arkansas area. He was commissioned to write a report and make evaluation of certain properties in the Arkoma basin area. For this work he was paid $800. He did other evaluation work on a job-by-job basis and was paid $583.67 for a supplemental report. He was the well geologist on a well drilled by plaintiff, and on December 15, 1964, sent statement to plaintiff, for which he was paid $10 per hour for his office analysis of the samples and $75 a day for his visits to the well site. The total paid defendant on this job was $502.50. Defendant was not a regular day-to-day employee of plaintiff and was paid no salary. On May 14, 1965, defendant bought 971 acres of leases at $3.00 per acre on the Atkins anticline. Sometime prior to the drilling of Acme No. 1, which was spudded on April 26, 1964, defendant had offered $1.00 per acre for the instant acreage.

On May 20, 1965, defendant again contacted plaintiff by telephone relative to curative title work on the Atkins leases. In the same conversation he offered to pay $3.00 per acre for the leases involved herein. Midwest's "Acme No. 1" well had had a show of gas in the early morning hours prior to that phone conversation. An agreement was made to sell the lease to defendant during the telephone conversation of May 20, 1965, and on May 25, 1965, the necessary assignments were executed and transmitted the next day. After purchasing the lease by telephone, defendant subsequently contacted Humble Oil, Midwest Oil, Shell Oil, Wilshire Oil and Steve Goss with a view to selling it. Ryan made an offer to sell the acreage at $20 to $25 an acre. Steve Goss and associates on May 25, 1965, agreed to and did purchase the acreage at $17.50 per acre.

Midwest well "Acme Brick No. 1" produced a show of gas in the early hours of May 20, 1965. The blooie pipe of "Acme Brick No. 1" on May 19 and 20 indicated a 6 to 8 million cubic feet pro-

duction. The early gas show was at 5,400 feet. On May 24, 1965, electrical and temperature logs indicated gas in the level between 5,402 and 5,412. This ten-foot-thick pay was considered very thin and the reserve small. Midwest was under contract to drill "Acme Brick No. 1" as a third in the series of test wells to a depth of 12,000 on behalf of Reynolds Metals from which it would receive certain acreage. There had been a great deal of activity in the past in what is known as the Mansfield field in shallow wells approximately 3,000 feet deep. The Midwest wells were deep wells and the show of gas in "Acme Brick No. 1" at the depth of 5,400 feet created a great deal of excitement in the oil and gas community in the western Arkansas area.[1] Three consulting geologists testified on behalf of the defendant that $3.00 per acre on May 21, 1965, was more than the reasonable market value because in their opinion this acreage was a speculation even after the show of gas in "Acme No. 1."

The plaintiff contends that it should recover the profit Ryan made on the lease purchased from it and sold to Goss because (1) the defendant breached the confidential relationship and trust existing between the parties, and (2) the defendant fraudulently procured the lease by misrepresenting the facts with respect to the show of gas in Midwest "Acme No. 1", and thereby deceived plaintiff.

The defendant contends that he did not misrepresent in any manner the facts as he knew them and as they existed on the morning of May 20 when he contacted plaintiff, and further that his employment by plaintiff was on a sporadic job-by-job basis and there was no continuing relationship which created any high degree of trust. In substance, the defendant takes the position that the parties negotiated the purchase and sale of the lease at arm's length, and that there were no misrepresentations of any kind, nor was there any duty to disclose what information the defendant had to the plaintiff.

As the court views the record, the issues as raised by the pleadings and the evidence adduced at the trial and the briefs are (a) whether or not a confidential relationship existed between the plaintiff and defendant and was breached by the defendant, and (b) whether or not the defendant procured the plaintiff's acreage by fraud or misrepresentation.

The evidence establishes that the defendant on May 20 disclosed to the plaintiff's officer, George Farmer, that there had been a show of gas in the "Acme No. 1" well, and that his opinion was that it would not be a commercial well. Farmer made specific inquiry of defendant as to whether or not there had been any gauges in the "Acme No. 1" well, and whether or not there had been any tests. The parties are in substantial dispute as to the exact words used by defendant, but the evidence establishes that he intended to and did give the plaintiff's officers the impression and the opinion that the show of gas was insignificant. The defendant misrepresented the knowledge he had in his possession if the telephone call was made May 20, because the information

---

1. Although the initial show of gas in Acme No. 1 was estimated to be between 6 and 8 million cubic feet per day, it subsequently developed that the well was not commercial. In the terms of the trade the pay was "thin," that is, the area of production of only 10 feet did not have a sufficient reserve to make it of commercial value. As a general proposition, the well would have been commercial if it produced as much as 500,000 cubic feet per day and had it produced 8 or 10 million cubic feet a day it would have been considered a "bonanza." Other wells which were the most immediate to the instant acreage were the Ambassador or Craig well which was a dry hole, the Wheeler-Ryan, Graves #1 drilled 7,600 feet which was likewise a dry hole, and the Residue well drilled 8,600 feet, a dry hole. The show of gas in Midwest "Acme No. 1," therefore, created a great deal of excitement because it was a deep well, and the initial blooie pipe tests indicated 6 to 8 million feet per day production.

available to him and which he had obtained indicated a good strong show of between 8 and 12 million cubic feet a day. Apart from any technical fiduciary relationship between the parties, the defendant and the plaintiff were not strangers to each other. The plaintiff had relied upon and had used the professional and technical advice of defendant over the past two years. Defendant was well aware that he was the only substantial contact that the plaintiff had in this area. As heretofore stated, defendant had made evaluations of acreage for the plaintiff and had been the well geologist on the well plaintiff drilled in December 1964. The plaintiff relied upon the truthfulness and integrity of the defendant in its transaction with him, and because of their previous relationship had a right to rely upon his being truthful and making a full disclosure. The defendant, however, throughout the trial and in his brief contended that a great deal of information was exchanged between the parties by virtue of the business practice of "swabbing." [2] In other words, information would be exchanged between the parties on a courtesy basis for which no remuneration was paid. The defendant argues that this is evidence that the transaction complained of herein was therefore an arm's-length bargaining. The record does disclose a continuing exchange of information for which no remuneration was paid, but such practice is not unusual between professionals in this industry and their clients as it is in any other business. Plaintiff was therefore misled by virtue of its reliance upon the evasive partial disclosure of defendant, its contact in the area, and with whom it had had a professional paying relationship in the past.

The defendant in support of his contention that no fiduciary relationship existed cites Southern Trust Co. v. Lucas, (8 Cir. 1917) 245 F. 286, and 36A C.J.S. p. 385. The brief of defendant contains the following quotation from 36A C.J.S. page 385:

"As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship. Thus mere respect for the judgment of another, or trust in his character, is usually not enough to constitute such a relationship; there must be such circumstances as indicate a just foundation for a belief that in giving advice or presenting arguments one is acting not in his own behalf, but in the interests of the other party."

■ The defendant's quotation sets out the general principles, but the next paragraph in this same section of 36A C.J.S. at page 385, contains the following statement of principles which are even more applicable:

"The relation arises whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another, or the property, or pecuniary interest, in the whole or in a part, or the bodily custody of one person is placed in the charge of another; and it may exist in the absence of a specific or technical trust or agency."

The Southern Trust case, supra, also discusses the general principles with respect to the creation and existence of a fiduciary relationship, and with which the court is in complete agreement, but it is not decisive in any manner in the instant action. These two citations are the only ones contained in the defendant's brief in support of his contentions.

■ The defendant is in no better position to take advantage of the plaintiff by misrepresenting the facts when inquiry was made of him by virtue of his being a complete stranger, even assuming, as the defendant contends, that the

---

**2.** "Swabbing" is a trade term used by the parties to describe the practice of securing information about oil and gas matters from someone without paying him for it or for his time.

parties were strangers and the transaction was negotiated at arm's length. As a general rule there is no duty between vendor and purchaser to disclose any information affecting the value of property in an arm's length transaction. However, any circumstance which gives rise to a duty to speak makes it incumbent upon both parties to deal fairly and truthfully with each other. A fiduciary relationship is only one instance in which there is a duty to speak. In circumstances in which one party knows the other is relying upon the truthfulness and there being a full disclosure of information, it is incumbent upon the party possessing such knowledge, if he speaks at all, to make a full disclosure. Especially is this true when specific inquiry is made of a party who possesses special knowledge, and he makes a partial disclosure intending that the other party shall rely upon it, and thus inducing the other party to be misled.

In 55 Am.Jur., Vendor and Purchaser, Sec. 88, page 563, the following statement is made with regard to circumstances in addition to technical fiduciary relationships that give rise to a duty to make truthful and full disclosures:

"While as a general rule a prospective purchaser of land does not owe the vendor any positive duty to inform him of facts or conditions affecting the value of the land, or to acquaint him with circumstances that may make the property desirable or advantageous to the purchaser, this rule does not apply where there exists some fiduciary relation between the vendor and the purchaser; and circumstances other than a fiduciary relationship may justify a vendor who was totally ignorant of the value of the land in relying on the purchaser's statements, especially when accompanied by representations as to its condition, and the like. The fact that the purchaser has special information regarding facts enhancing the ordinary value of land places him under a legal obligation to do no act or make any representation cal- culated to mislead the owner in the belief that there was no special con- dition affecting the value. The purchaser must make no statement calculated to mislead the vendor or prevent an examination of the property involved; he is not permitted to say or do anything to throw the vendor off his guard in order to obtain the property from him. It has been said that the least degree of misrepresentation constitutes very potent evidence of fraud under such circumstances."

Partial disclosure can and often does mislead and create a deceit when no disclosure at all would not have created any false impression. A concise but full demonstration of this principle is found in 55 Am.Jur., Sec. 88, at page 564, as follows:

"Fraud may be predicated upon an equivocal, evasive, *or misleading answer calculated to convey a false impression even though it may be literally true as far as it goes. A partial and fragmentary disclosure accompanied by wilful concealment of material and qualifying facts is not a true statement and is often as much a fraud as an actual representation.* In such cases if the vendor does in fact rely upon the information given him by the purchaser which is false or misleading, equity will grant him relief from the contract that he was thus induced to enter into."

By virtue of the previous transactions and confidences reposed in each other by the parties hereto, the following statement from 56 A.L.R. 434, an Annotation entitled "Value of Property—Purchaser's Duty," at page 434 seems particularly applicable:

"So, while recognizing that the prospective purchaser would not ordinarily owe the vendor the positive duty to inform the latter as to facts or conditions affecting the value of the land, in the absence of exceptional circumstances, the courts have widely held that there are other cir-

cumstances not involving a fiduciary relationship, under which the vendor may have the right to rely upon the prospective purchaser telling the entire truth with respect to facts and conditions bearing upon such value, as where the vendor, being unacquainted with the land, specifically inquires what it is worth, or as to some particular matter which bears upon its value, or where to the purchaser's knowledge vendor is in such a position that he cannot well find out the facts for himself, and so trusts the other to deal fairly with him. Under such circumstances it becomes the purchaser's duty to speak the truth, if he undertakes to speak at all, and a concealment or suppression of the truth, where coupled with any actual misrepresentation or overreaching, however slight, may be sufficient to entitle the vendor to have the deed set aside, the circumstances amounting to fraud or deceit."

\* \* \* \* \* \*

"ARKANSAS.—Warren v. Martin (1925) 168 Ark. 682, 272 S.W. 367."

■ Partial disclosure by one party as an inducement to obtain a deed may under the circumstances be a sufficient basis to cancel or set aside the deed even in the absence of any technical fiduciary relationship. See Reed v. Rumph, 170 Ark. 258, 280 S.W. 357 (1926) ; Stewart v. Clark, 195 Ark. 943, 115 S.W.2d 887 (1938) ; Levinson v. Treadway, 190 Ark. 201, 78 S.W.2d 59 (1935).

In Trout v. Harrell, 217 Ark. 670, 233 S.W.2d 233 (1950), the plaintiff sought to cancel a deed on the grounds that it was obtained by misrepresentations. The court at page 672, 233 S.W.2d at page 234 concluded its summary of the facts with the following statement:

"A few hours after Mrs. Trout had signed the warranty deed to Ross Harrell, he sold to Weadock an oil and gas lease on the purchased property for as much as he had paid Mrs. Trout for the deed for her entire interest in the lands. Before the royalty deed was actually signed and before Mrs. Trout's deed was taken from escrow, she filed this suit to cancel and rescind her deed to Ross Harrell on the ground that it had been obtained from her by fraud. The evidence as to the fraud consists, inter alia, in the fact that Mrs. Trout inquired of Ross Harrell, before she executed the deed, as to whether there had been any offers to lease the land for oil and gas ; and he told her there had been no such offers, when in fact he knew that there had been such offers and that he had come to El Dorado for such purpose."

In analyzing the respective duties of vendor and purchaser, the court at page 672, 233 S.W.2d at page 234 stated:

"The law is well settled that when parties are sui juris and deal at 'arm's length' and in no confidential relationship, the prospective purchaser is under no obligation to volunteer information to the vendor; but if in such a situation, the vendor makes inquiry of material matters and the purchaser undertakes to make answers, then such answers must be truthful, unequivocal and non-evasive. The rationale of the holdings is summarized in 23 Am. Jur. 860:

" 'Response to Inquiries—A party of whom inquiry is made concerning the facts involved in a transaction must not, according to well-settled principles, conceal or fail to disclose any pertinent or material information in replying thereto, else he will be chargeable with fraud. The reason for the rule is simple and precise. Where one responds to an inquiry, it is his duty to impart correct information. Thus, one who responds to an inquiry is guilty of fraud if he denies all knowledge of a fact which he knows to exist, if he

gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth * * *.' "

The Supreme Court in Trout v. Harrell, supra, emphasized the duty of honesty and truthfulness in representations made between those parties in the status of vendor and purchaser without regard to any confidential relationship. When a party undertakes to speak and conceals or suppresses the truth, such partial disclosure and concealment which induces the other party to part with his property may constitute fraud or deceit. The court at page 673 of 217 Ark., 233 S.W.2d 233 quoted with approval the paragraph of 56 A.L.R. 434 set out above. As applied to the instant action, the following statement with respect to the duty of a purchaser apart from any fiduciary relationship is made beginning at page 676 of 217 Ark., at page 236 of 233 S.W. 2d:

"We are not deciding the present case on any theory of confidential relationship. We are mentioning these matters to show that in the timber dealings between the parties Mrs. Trout did in fact rely on Ross Harrell; and that, likewise, in this deed matter she did rely on the answers made by Ross Harrell to her inquiry; and she is entitled to rescind the transaction because such answers lacked that truth, candor and non-evasiveness which are essential."

In the instant action the parties have dealt with each other over a substantial period of time, and confidence has been reposed by each in the other. The plaintiff had in the past relied upon the truthfulness and integrity of the defendant in his dealings and his report to it. The circumstances out of which their relationship began and continued and up to the transaction which is the basis of this action created a relationship of confidence and trust between the parties. Apart from the technical elements of a fiduciary relationship, the circumstances surrounding these parties' various dealings made it incumbent upon the defendant to truthfully disclose facts in his possession affecting the value of the plaintiff's property, and his partial disclosure, combined with his concealment, amounts to such a misrepresentation to entitle the plaintiff to relief. The partial disclosure with respect to the show of gas was a material element in inducing plaintiff to part with its property. The defendant had in his possession knowledge which affected the market value of the acreage, and which he intended and did avail himself of and profit by selling the lease to a third party almost immediately after consummating the assignment from plaintiff. The partial disclosure by the defendant was a misrepresentation which did mislead the plaintiff and induced it to assign its acreage to the defendant. The transaction, even if viewed as one between strangers at arm's length, is permeated with such concealment and misrepresentation that the plaintiff should be granted relief in the interest of fair dealing and common honesty. The defendant has thus unjustly enriched himself, and cannot be allowed to retain the fruits of his misrepresentation and concealment in his dealing with plaintiff.

Therefore, in accordance with the above an order is being entered today as prayed in the complaint, granting judgment in favor of the plaintiff, Consolidated Oil and Gas, Inc., and against the defendant, Dorsey M. Ryan, in the sum of $20,171.24, with interest at six percent per annum from July 27, 1965, until paid, and with the further provision that the one percent overriding royalty interest retained by the defendant be reassigned to the plaintiff.

## ON MOTION FOR NEW TRIAL

This case was tried to the court December 9, 1965. The opinion of the court was filed January 5, 1966, and judgment in accordance therewith entered on the same date. The defendant on January 14, 1966, filed a motion for a new trial. There is before the court the defendant's motion for new trial, which the court has

considered along with the brief of the defendant in support of his contentions and the brief of the plaintiff in opposition thereto.

The defendant Ryan in his brief in support of his motion for new trial contends that the court erroneously construed and applied the applicable principles of law to the facts as developed by the testimony adduced at the trial. In particular, the defendant contends that no fiduciary relationship existed between the plaintiff and the defendant, and further that the plaintiff was not entitled to rely upon the statements or misstatements, if any, made by the defendant.

The defendant also contends that the plaintiff's representatives could have obtained accurate and full information with respect to the condition and circumstances surrounding the show of gas in the Midwest well. The defendant thus asserts that the plaintiff, to its detriment, failed to independently confirm the information reported to it by the defendant concerning the Midwest well.

The defendant's brief emphasizes that the citations and authorities discussed in the court's opinion are not in themselves decisive of this matter and that the facts in the court's citations in its opinion are distinguishable from the instant case. The court is well aware that the cases cited in its opinion have certain factual dissimilarities from those in the instant action. These same factual dissimilarities also exist in the cases cited in the defendant's brief in support of the motion for new trial. The similarity or lack of it between the facts in the cases cited in the defendant's brief or in the court's opinion is certainly not decisive of this controversy. The general principles as discussed in the court's opinion abstracted from the cases cited therein must, of course, be analyzed and applied to the facts as the court finds them in this or any other case. To the same effect the cases cited in the defendant's brief must be analyzed and the principles applied to the facts as the court finds them in the instant case.

■ The defendant seems to belabor his contention that no fiduciary relationship existed between the plaintiff and the defendant. The judgment of the court was not based upon the existence of a technical fiduciary relationship, but upon the principles of law discussed and applied to the facts found by the court as set forth in the opinion. As the court attempted to carefully point out the operative facts which it found to be dispositive of the instant matter were (a) concealment and misrepresentation on the part of the defendant, and (b) reliance thereon by the plaintiff because of the trust and confidence existing between the parties as a result of a series of business relations in the past creating mutual trust and confidence. The Supreme Court cases of Arkansas discussed in the court's opinion enumerate the general principles with respect to the duties of a vendor and purchaser making truthful and full disclosure to each other without misrepresenting facts known to either of them. In the opinion of the court the evidence adduced at the trial established a misrepresentation and concealment on the part of the defendant which the court found to be fraudulent and which induced plaintiff to assign the lease to defendant.

■ The defendant argues in his brief that the plaintiff could have ascertained the true facts with respect to the show of gas in the Midwest well by contacting other persons or from Ira Rhinehart's oil report of May 27, 1965. The Rhinehart oil and gas report, as the defendant recognized on page 11 of his brief, was not received by the plaintiff until May 27, 1965, which was after the plaintiff, on the insistence of defendant, assigned and transmitted its lease to the defendant. The issue of whether or not the plaintiff had a right to rely upon the statements made to it by the defendant was discussed and analyzed in detail in the court's opinion. Nothing would be served by restating the reasons why the court found the plaintiff had a right to rely upon the statements made by the defendant. As reflected in that opinion, and after further examination of the testimony, plead-

ings, exhibits and briefs, the court is of the opinion that the plaintiff had a right to rely upon the statements made by the defendant; that the plaintiff did rely upon such statements; that the statements were a misrepresentation and concealment of the facts with respect to the Midwest well; and the plaintiff was thereby damaged.

Therefore, in accordance with the above an order is being entered today overruling and denying the defendant's motion for new trial.