**John ZIMPEL, Administrator of the Estate of Hedwig Zimpel, Plaintiff,**

v.

**Larry E. TRAWICK and Charles W. Brown, Defendants.**

**Civ. No. 87-2068.**

United States District Court, W.D. Arkansas, Fayetteville Division.

Jan. 28, 1988.

James E. West, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for plaintiff.

Charles Karr, Martin, Vater & Karr, Fort Smith, Ark., Bill Gossett, Garvin, Bonney, Weaver & Corley, Duncan, Okl., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This action was commenced by Hedwig Zimpel in the Circuit Court of Johnson County, Arkansas, seeking compensatory and punitive damages which she claims resulted from her transfer to the defendants of certain mineral interests which she owned located in Comanche County, Oklahoma. In her complaint she claims that she agreed to convey the mineral rights, and conveyed them, for less than fair mar-

ket value because of the fraud and deceit of the defendants.

At the time the action was filed the plaintiff was a citizen and resident of Johnson County, Arkansas, and the defendants were both citizens of Oklahoma. Thus, the court has jurisdiction by reason of diversity of citizenship and the amount in controversy.

## FINDINGS OF FACT

In 1910 the father of Hedwig Zimpel acquired 50 acres of land located in Comanche County, Oklahoma, and owned and farmed it until the surface was sold in the 1930s. At the time of the sale, the grantor reserved all or part of the mineral rights.

Hedwig Zimpel's father died many years ago, survived by Hedwig and a brother and two sisters. Hedwig was married for a brief period during World War II but was unmarried and living alone at the time of the occurrence described in more detail below. As far as her relatives know, her only income was from social security, a small retirement, and interest on certificates of deposit. It appears that she was, by no means, experienced in the ways of the business world.

In mid-August of 1986 drilling commenced on lands located near and in the same section with the lands under which the Zimpel interests were located. Defendants, Larry E. Trawick and Charles W. Brown, were partners or joint venturers in an endeavor in which they speculated in mineral interests, and they became aware of the drilling operation. By not later than October 2, 1986, they knew that the well being drilled was "tight holed," which Trawick explained means, in the industry, that signs are posted around the well warning spectators to stay away, and the drilling entity releases no information in respect to the well. All information is kept private and, according to Trawick, "that usually does mean that they have something to conceal information about." In short, it is obvious to the court that when a well is "tight holed" it means to persons in the industry that the driller expects a good and productive well.

Defendant Brown's father-in-law had experience in the drilling industry and knew some of the individuals operating the drilling rig. He was able to obtain from the operators certain information in relation to a test of the well that was supposed to have occurred on October 6, 1986. He related to Brown and Trawick that the test showed that the well was capable of producing 10,000,000 cubic feet of gas and 792 barrels of oil per day. Trawick says that that was a good well. Then, on October 8, 1986, they obtained, again through Brown's father-in-law, more specific data in relation to the well test. That data is set forth in an October 14, 1986, letter which Brown wrote to an individual to whom he was hoping to sell mineral interests, and was introduced as Plaintiff's Exhibit 2. The information contained in that letter shows that Trawick and Brown, as early as October 8, 1986, had access to the actual test results of the test conducted on the well.

Trawick then immediately began checking the records in Comanche County to determine who owned mineral interests around the well and discovered the Zimpel interest. He started calling the owners of the mineral interests and, on October 6, 1986, called Hedwig and asked her if she was interested in selling her mineral interest. She told him that he should call her brother, John Zimpel, who also resided in Johnson County, Arkansas.

Trawick called John Zimpel on the same day and, in his testimony at the trial, he admits that they may have discussed the generally depressed condition of the oil and gas business and that the "boom times were over." He seems to admit that they, among other things, discussed high prices that mineral interests had once brought in the Comanche County, Oklahoma, area, but that those times were past.

John Zimpel's recollection of the conversation was much more specific, and the court believes Mr. Zimpel's version. In fact, while Trawick specifically denied that he made some of the statements attributed to him by Zimpel, he does, in the court's view, agree that there was at least a discussion of "how bad things were" in the

area. John Zimpel says that immediately after Trawick identified himself and told him that he was interested in buying their mineral interests: "I asked him, I said well you're the fourth one, what's the interest there? Why are people calling now? He said, well there are some people—we've got some people that just want to buy minerals in Western Oklahoma. I said, is there any activity there and he said no, not at this time." John Zimpel asked Trawick to write him a letter giving him his best bid.

On October 8, 1986, Trawick wrote John Zimpel the letter which was received as Plaintiff's Exhibit 1. He offered "a starting bid of $1,000 and would like for you to get back with me if you have a price that you will sell at." The letter then says: "I realize that several years ago things were quite different than they are now in the area and as a matter of fact, in all of Oklahoma."

After receiving the letter, John Zimpel took it to Hedwig and told her that the offer was not attractive to him, but if she needed to sell a few acres she should get a good price for it and advised her that, based on what Trawick had said, the interest was not worth much.

On October 14 Hedwig attempted to call Trawick and left word with the person answering the phone for him to call her. He returned the call on the 15th but she advised him that she was ill and was on her way to the doctor. He called again on the 15th after she returned from her visit to the doctor and admits that they discussed, to some degree at least, her health problems. He also agrees that he told her, either in the telephone conversation or at their subsequent in person meeting described below, that the oil market was depressed. She told him that she needed some money and that she was willing to sell six or seven mineral acres of her sixteen and two-thirds mineral acres. After some discussion, it was agreed that he would pay her $1,500 per acre for that portion of her interest. Further discussion ensued, and he asked her what she would take for her entire interest. She replied that she would accept $2,000 per acre and

she was surprised that he quickly agreed. After further discussion, she agreed to sell him fifteen acres of her interest for $30,-000. According to Trawick they then "laughed about neither side backing out" and the deal was struck. He agreed to drive to her home in Charleston, Arkansas, a drive of approximately 300 miles, that very day, and estimated that he could be there by 6:00 p.m. He apparently left immediately and arrived at exactly the estimated time.

Hedwig met him on the front porch of her home wearing an oxygen apparatus attached by tubes from her nostrils to an oxygen bottle. He says that she was obviously in ill health and, in fact, that "it was a very sad discussion at her house." During the discussion, she wore the oxygen apparatus, and told him that she thought that she was going to die. She said that she was worried about her expenses and that her drug bills alone amounted to $600 per month. According to Trawick, she said that "she did not want to die owing anyone any money—wanted to die debtfree." Trawick said "I believe that is the reason she decided to sell her minerals."

Trawick admitted in his testimony that, during his discussion with Hedwig, there was again a general discussion of the depressed condition of the oil and gas business in Oklahoma, but he denies that she asked him specific questions about activity in the area.

Trawick did not tell Ms. Zimpel about the productive well that had been drilled because she didn't ask about it. At the trial, his position seemed to be that he had no obligation to do so and that this was a rather ordinary business deal. According to him, she offered to sell her mineral interest and he accepted. This was true even though it was obvious from Trawick's testimony that he realized that the productive well nearby had a very material effect on the market value of adjoining mineral interests. After agreeing that he did not disclose existence of that well to her, he testified: "I guess maybe if I were to knock on her door and tell her everything I knew about the well she probably wouldn't

have been interested in selling ... I don't think anybody would." He then, in answer to specific questions by plaintiff's counsel, agreed that the existence of the well and the test data that he had access to had an impact on the market value of Hedwig's interests.

During his visit to her home Trawick handed to Ms. Zimpel a $30,000 draft and she executed the deed that he had brought with him from Oklahoma, conveying to him 15 acres of her mineral interest. The deed was undated and not acknowledged at the time.

Beginning on October 14, 1986, Trawick and Brown began to attempt to "peddle" mineral interests in Comanche County, Oklahoma, which they had acquired from others, including Ms. Zimpel. Letters dated October 14, October 17 and October 24, 1986, were introduced as Plaintiff's Exhibits 2, 3 and 4, and the interests are discussed in laudatory terms with the specific test results that they had obtained from the "tight holed" well obviously being utilized in the hopes of enhancing the purchase price. By October 30, 1986, the defendants had obtained a buyer for the interests that they had acquired for a purchase price of $3,300 per acre. After the purchaser was obtained, the $30,000 draft delivered to Hedwig was honored and defendant Brown acknowledged the deed on October 30, 1986, backdating both the deed and the acknowledgment to October 1, 1986. Ms. Zimpel's mineral interest was sold by the defendant for $3,300 per acre, with the conveyance taking place on November 5, 1986.

Trawick agrees that, subsequent to Hedwig's conveyance to the defendants of her interest, he made several telephone calls to her in an attempt to purchase her remaining one and two-thirds acres. The evidence indicates that these calls stopped only after John Zimpel directed him not to call her again.

After John Zimpel learned that Hedwig had sold substantially all of her mineral interests to the defendants, he called an acquaintance who lived near the well who said, after Zimpel identified himself: "Boy, you have a good well out here." He said that "it shook the ground when they turned it loose."

John Zimpel then advised his sister of the well. Because there is a substantial dispute about whether statements made by Hedwig to John Zimpel are admissible,[1] and because the court does not believe that it is necessary to rely to any degree on such statements, the court will not consider them in arriving at its conclusions in this matter, and will not utilize such statements in arriving at the court's findings of fact. The statements and their admissibility will be discussed in the discussion and conclusions of law below.

Suffice it to say that after the discussions with Hedwig, John Zimpel called Trawick and offered to return his money if he would reconvey Hedwig's mineral interests to her. According to Trawick's testimony, he first told Zimpel that "she probably doesn't have enough money to buy them back," and when he was assured that she did, he declined to do so. In fact, either in that conversation or others near that time, he offered John Zimpel $3,000 an acre for his interest.

## DISCUSSION AND CONCLUSIONS OF LAW

Shortly after this matter was removed to this court the plaintiff requested a jury trial. Both parties subsequently waived a jury and the matter was tried to the court. Prior to the waiver, the defendants properly raised the question of whether John Zimpel would be permitted to testify at the trial about statements that he claims his sister made to him in relation to her conversation with Trawick at the time of the transfer of the property, and statements that Trawick allegedly made to her at that time. Defendants contended, and now contend, that such statements are hearsay and are excluded by Rule 802 of the Federal Rules of Evidence. Plaintiff answered that

1. On August 7, 1987, prior to the trial, Hedwig Zimpel died and John Zimpel, as the administrator of her estate, was substituted as party plaintiff.

the statements were not being offered to prove the truth of the matters asserted and are admissible, and cited *Luster v. Retail Credit Co.*, 575 F.2d 609 (8th Cir.1978); *Motors Insurance Corp. v. Lopez*, 217 Ark. 203, 229 S.W.2d 228 (1950); and *Mikel v. Development Co., Inc.*, 260 Ark. 365, 602 S.W.2d 630 (1980).

After the right to a jury trial was waived by the parties, the court announced that it would take the matter under advisement, but would allow the testimony at the trial to be considered as plaintiff's offer of proof in the event that the court ultimately concluded that the evidence would be excluded. Of course, prior to hearing the testimony at the trial, it was necessary for the parties to apprise the court in detail of the testimony so that a ruling could be made, so the court concluded that no harm would be done in allowing the testimony at the trial, subject to a later ruling by the court on its admissibility.

In this respect, John Zimpel testified that after he told Hedwig about his conversation with the person who resided near the well site she said: "He lied to me. I wish I hadn't sold it." He said that she then told him that she asked Trawick "what the hurry was" and why she had received three or four calls in relation to her interests. She said that she asked him if there was any activity in the area and he told her that there was some up north and that that was all that he could pay. John Zimpel claimed that Hedwig also told him that Trawick said that even if they hit a gusher it would take seven or eight years to recover the amount that he was paying for her interests.

The court has concluded that that testimony is excluded by the hearsay rule. It is true that hearsay, by definition, does not include evidence offered for some purpose other than to prove the truth of the matter asserted. Any court faced with this issue must first determine the purpose for the proffered testimony. In the words of the esteemed Arkansas law teacher, author and sometimes jurist, Robert A. Leflar, while serving as a justice of the Arkansas Supreme Court:

If this evidence was received or considered by the jury for the purpose of establishing the truth of what was asserted in it, that is, for the purpose of proving the extent to which the car was damaged, it was inadmissible hearsay, and prejudicial error was committed in allowing it to go to the jury. If on the other hand the mere fact that the statements were made to and heard by Lopez was itself relevant to some issue in the case, and the jury was restricted to consideration of the statements on that issue solely, there would be no violation of the hearsay rule.

*Motors Ins. Corp. v. Lopez*, 217 Ark. 203, 207–208, 229 S.W.2d 228 (1950).

In other words, the court must determine whether it was relevant to any issue in this trial for the trier of fact to know that Hedwig Zimpel told John Zimpel of her conversation with Trawick. As Judge Leflar pointed out, the question is whether it is relevant that Hedwig's statement was made to and heard by John Zimpel. The court has concluded that it is not relevant, and it makes no difference in the determination of the issues present in this case whether, in fact, John Zimpel heard Hedwig Zimpel say what he said that she said.

It should be pointed out that this is not a case where the witness at the trial is attempting to testify about statements that he heard Trawick make. If that was the case, there is little question that it would be relevant and admissible. However, in our situation John Zimpel is attempting to testify to what he claims Hedwig Zimpel told him that Trawick said to her.

Why does the plaintiff wish the trier of fact to hear of that alleged conversation? What does plaintiff hope the court will be caused to believe by such testimony? It is not simply that John Zimpel heard Hedwig say what it is claimed she said. Instead, plaintiff hopes that the court, because of the testimony, will believe that Hedwig Zimpel was, in fact, defrauded by Trawick and his partner. The question that is relevant to that issue is whether Hedwig Zimpel did, in fact, ask Trawick "what's the hurry?" and "is there any activity there?"

and whether she received the responses that Zimpel claims that she said she received. That's the question that plaintiff hopes that the proffered testimony will help the court answer. In the words of Judge Leflar, the question becomes whether "the mere fact that the statements were made to and heard by [Zimpel] was itself relevant to some issue in the case." The court has concluded that it was not. The proffered testimony was not considered by the court in arriving at its findings of fact set forth above and will not be considered in arriving at the decision in this case.

The question then becomes whether there is still sufficient evidence for the court to conclude that plaintiff's decedent was caused to convey her mineral interests for less than fair market value because of the fraud and deceit perpetrated by Trawick, acting for the benefit of himself and his partner, Brown. For if there is not the evidence required by Arkansas law present for such a ruling, the court is not permitted to grant the plaintiff relief irrespective of how it may feel about the propriety of the actions taken by the defendants. The court believes that most human beings would find the actions of Trawick and his partner in this case to be detestable. In the court's view, the evidence indicates that Trawick should have known, and probably did know, that he was preying upon a sick, unsophisticated woman alone in the world who, because of anxiety about her health and attendant medical expenses, was especially vulnerable. Not only did Trawick come from Oklahoma and negotiate the transaction with this particularly vulnerable target while she was strapped to her oxygen bottle, he came armed with knowledge about conditions at the location of the interests some 300 miles from Hedwig's home which had a substantial impact upon the value of her mineral interest which he hoped to purchase.

It appeared to the court that, during the trial, Mr. Trawick seemed to believe that that was "just business." Perhaps that is true in this particular business but in other walks of life society does not permit it. Ivan Boesky is going to jail for acts no more pernicious.

Be that as it may, in this case it is this court's duty to determine, as best it can, Arkansas law in respect to matters such as this and to apply that law to the facts which it believes to be supported by the evidence. In this respect, the general rule is that there is no duty between vendor and purchaser to disclose any information affecting the value of property in an arm's length transaction. There are, however, circumstances which may give rise to a duty to speak, and when those circumstances exist, it is incumbent upon both parties to deal fairly and truthfully with each other. *Consolidated Oil and Gas, Inc. v. Ryan,* 250 F.Supp. 600 (W.D.Ark. 1966), *aff'd,* 368 F.2d 177 (8th Cir.1966).

The article in 37 Am.Jur.2d *Fraud and Deceit* § 146 discusses some of the circumstances which cause an obligation to communicate facts known only by one side to arise.

"Among other ways, the obligation to communicate facts may arise from the fact that one of the parties has superior knowledge or means of knowledge; ... [or] from the fact that a party does something or says something which, for want of the disclosure, is false and deceptive...."

In respect to the statement in relation to superior knowledge possessed by one of the parties, the article says:

Knowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing. There is abundant authority to the effect that if one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to

enable him to judge of the expediency of the bargain or transaction.

*Id.* at § 148 (citing cases).

In addition, as this article also points out, if a party under no obligation to speak starts talking, he must tell the truth. In the words of the article:

Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all, he must make a full and fair disclosure. Therefore, if one willfully conceals and suppresses such facts and thereby leads the other party to believe that the matters to which the statements made relate are different from what they actually are, he is guilty of a fraudulent concealment. Thus, one having full information and representing that he has, is guilty of fraud if he, with intent to deceive, overreach, or prevent investigation, discloses a part of his information only, and by words or conduct leads the one with whom he contracts to believe that he has made a full disclosure; and if the party with whom he is dealing is induced to enter into the contract in reliance upon the disclosure made and in ignorance of the true facts, equity will grant him relief.

*Id.* at § 151 (citing cases).

Restatement (Second) of Torts § 529 concurs:

A representation stating the truth as far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matters is a fraudulent misrepresentation.

Arkansas cases on point confirm that the law as expressed in the Am.Jur. article and in the Restatement (Second) of Torts is also the law in Arkansas. In the early case of *Warren v. Martin*, 168 Ark. 682, 272 S.W. 367 (1925), the Arkansas Supreme Court was faced with a case in which the facts were strikingly similar to the facts in this case. The court set forth the facts as follows:

C.M. Martin, who had kept in close touch with the V.K.F. discovery well in the Smackover oil field, near the land in question, came into the possession of evidences indicating that the well would become a producer, which it did. Relying upon these evidences, he set about to buy oil, gas, and mineral interests in lands near the well, and, in carrying out these policies, entered into a contract with Mandy Johnson, through her representative, Sid Umstead, to purchase a sixty-three sixty-fourths interest in the oil, gas and mineral in said land for $2,000, ... The only way the deed could be obtained for a nominal consideration was to make it appear that the equity in the land was of little value and would be swallowed up by the Watts Brothers' mortgage unless appellant, her brother and Mandy should dispose of the oil, gas, and mineral interest in the land immediately.

*Warren v. Martin*, 168 Ark. 682, 691, 272 S.W. 367 (1925).

Based on those facts, the court concluded: "We are convinced by a preponderance of the evidence that appellant was induced to execute the deed through misrepresentation on which she had a right to and did rely," and in reaching that conclusion the court reasoned:

At the time Evans and Fortch procured the quitclaim deed from appellant, she and C.M. Martin were not on an equal footing. The same opportunity to ascertain and know the value of the land was not open to each. Martin was upon the ground, with knowledge of recent oil developments in the field, and appellant was residing at a distance, without information or knowledge that the oil well located near the land was about to, or had, come in, and that oil, gas, and mineral interests in every direction from the discovery well were in demand and being purchased. Appellant could neither read nor write and had not even heard of the death of her brother. The development in the oil field, also known to Martin, was withheld from appellant, and she was

induced to execute a quitclaim deed either upon the representation that the land was of little value and that it was necessary to sign the deed immediately in order for her, her brother and Mandy to get anything more than the mortgage out of it, or to prevent Mandy, who was in distress, from losing her home.

*Id.* at 692–93, 272 S.W. 367. *See also* Judge Miller's opinion in *Ryan, supra.*

The court has little doubt but that there is ample evidence in this case for this court to determine that Trawick's actions in inducing Hedwig Zimpel to part with her mineral interest constituted fraud and deceit. In the first place, as already pointed out, they were not even arguably on equal footing. Trawick and his partner, knowledgable speculators in the oil and gas business, residing near Comanche, Oklahoma, and near a well that had recently been drilled that showed tremendous promise, gained inside information, by whatever means, which had a tremendous impact upon the value of mineral interests in the area near the well. Armed with that knowledge, Trawick called Hedwig Zimpel and, at the brother's request, wrote the letter which was received as Plaintiff's Exhibit 1. Perhaps the law is, in relation to matters such as this, that he had no initial duty to speak at all about factors that might have an influence on the value of the interests that he desired to purchase, but he did. In that letter he said: "I realize that several years ago things were quite different than they are now in the area and as a matter of fact, in all of Oklahoma." Then, John Zimpel testified, and the court believes, that in response to specific questions posed to him by Zimpel, he said that there was no activity in the area and that he was only interested because he knew some people who were interested in buying mineral interests in that part of Oklahoma. The facts indicate that, after that telephone conversation, John Zimpel visited with Hedwig and presented the letter to her. He told her that he was not interested, but that if she needed to sell some of her interest, she should get a good price for it. He says that he then told her that, based upon what Trawick said, the interest was probably not worth much.

■ After Hedwig received that information from her brother, after a telephone call from her, Trawick journeyed that very day some 300 miles to Charleston, Arkansas, and was met on the front porch of her residence by a small woman who was obviously quite ill, strapped to an oxygen bottle. He admits that they discussed the general depressed conditions in the oil and gas business and her perceived need for money to pay off her debts before she died, a death that she believed to be imminent. It is true that, without the hearsay evidence which the court has excluded, there is no evidence that indicates that Hedwig specifically asked Trawick about activity in the area, but the fact is that he admits that he did speak in relation to land values in the area. He told her, in effect, that the oil and gas business was depressed, obviously to lead her to believe that the mineral interests which she owned were not worth much. Based on the law as outlined above, the court believes that once Trawick began to speak on this subject, he had the duty to tell the whole truth. After he led her to believe that her mineral interest was not worth much because of depressed conditions, he had the further duty to tell her that a well had been recently completed on adjoining property which showed great promise and which would unquestionably cause an appreciation in the value of her interest. Trawick and Brown obviously knew it by then because they were trying to peddle the interests that they hoped to purchase as early as October 14 by the use of letters containing very specific test information. Trawick admitted that he had no more information available to him in relation to the well on October 14 than he did on October 8, so it is obvious that he had that "inside information" at the time that he first contacted Hedwig Zimpel.

As Trawick seems to believe, that may be "business as usual," but it is simply both unfair and not permitted by the law of Arkansas or most other jurisdictions. He came from Oklahoma to Charleston, Arkansas, to deal with a sick unsophisticated lady

knowing of circumstances that unquestionably enhanced the value of her mineral interest. Not only did he do that, he then misled her into believing that it was probably not worth much because of depressed conditions. It was obvious to him, or should have been, that they were not on equal footing. During his testimony, he declined to admit that it would not have been reasonable to expect Hedwig, with her oxygen bottle and apparatus, to journey to Comanche to discover the facts that he already knew, but the court believes that his answer to that question was not necessary. It should have been obvious that the lady, in her condition, could not reasonably be expected to do so.

■ The court is firmly convinced that the evidence abundantly shows that Trawick and his partner, through the use of superior knowledge not reasonably within the reach of Hedwig Zimpel, and through the failure to disclose facts about which they had knowledge and a duty to disclose, fraudulently caused her to convey her mineral interest to the defendants for substantially less than fair market value.

Having found that the plaintiff's decedent was the victim of fraudulent misrepresentation, the court must now determine whether the plaintiff may recover damages and, if so, the amount of the damages. In order for one to recover, there must be justifiable reliance upon the matters misrepresented. Sections 537 and 538 of Restatement (Second) of Torts sets forth the law applicable in most jurisdictions as follows:

§ 537. General Rule

The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if,

(a) he relies on the misrepresentation in acting or refraining from action, and

(b) his reliance is justifiable.

§ 538. Materiality of Misrepresentation

(1) Reliance upon a fraudulent misrepresentation is not justifiable unless the matter misrepresented is material.

(2) The matter is material if

(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

■ Based on the evidence in this case, the court has no difficulty in determining that Hedwig Zimpel relied upon the misrepresentations made by Trawick. It is clear from the evidence that she had no knowledge about the value of the interest that Trawick purchased from her and that she relied upon his representation which, in effect, conveyed to her the impression that the interest was not worth much.

Likewise, the court has no difficulty in determining that the reliance was justifiable. The matter misrepresented or not disclosed was clearly material. In fact, as pointed out above, Trawick admitted that it was when he agreed that Ms. Zimpel would probably not have sold the mineral interest to him if she had known what he knew and that, in fact, no one with that knowledge would.

That leaves only the question of causation and damages for the court to determine. In this respect, sections 546 and 549 of the Restatement (Second) of Torts say:

§ 546. Causation in Fact

The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.

§ 549. Measure of Damages for Fraudulent Misrepresentation

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of

which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

\* \* \* \* \* \*

In 37 Am.Jur.2d *Fraud and Deceit* § 371 it is said:

Thus, the measure of damages recoverable in an action for deceit by vendor, based upon fraud of the purchaser in inducing the plaintiff to convey the property, is generally stated to be the difference between the consideration received by the defrauded vendor and the actual value of the property conveyed, at the time of the conveyance (citing cases).

In *Republic Mining & Mfg. Co. v. Elrod*, 208 Ark. 150, 152, 185 S.W.2d 99 (1945), the court said: "[T]he measure of damages would be the difference between the value of the property at the time the sale is made and the price paid."

■ Thus, it is clear that the plaintiff should recover in this case the difference between fair market value at the time of the conveyance and the $30,000 purchase price paid by the defendants. The law in Arkansas in relation to the definition of fair market value is properly set forth in Arkansas Model Jury Instruction 2220 as follows:

When I use the expression "fair market value," I mean the price that the [property] would bring on the open market in a sale between a seller who is willing to sell and a buyer who is willing and able to buy after a reasonable opportunity for negotiations.

In this case, the best evidence of that value is the sale that the defendants made to third parties on or before the date that their draft delivered to Ms. Zimpel was honored. That was clearly an arms-length transaction. That purchase price was $3,300 per acre, so the court is convinced that the defendants should be required to pay to the plaintiff compensatory damages in the amount of $19,500.

At the trial defendants called a claimed expert on values, Fletcher Lewis, who testified that the fair market value of the property at the time of the purchase by the defendants was $1,600 per acre. In the first place, that testimony defies logic since we know for certain that the defendants purchased it for more than that and sold it for over twice that amount. As the court understood Mr. Lewis' testimony, he, through various calculations that were hardly understandable, calculated how much gas and oil the well would produce and how much it could be sold for. He then, in effect, says that no one in his right mind would give more than these calculations justified. That may be true, but in the real world we all know that fair market value of objects or property often have little or no relation to the productivity of the object or property. Mr. Lewis' calculations and testimony are akin to determining the fair market value of scenic acreage lying along the White River in beautiful Northwest Arkansas by determining how many cows the valleys and hills will carry and the profit that one can make on them. We all know that fair market value is determined by what people in the market are willing to give for property and what sellers are willing to take, and the law of Arkansas recognizes that and defines fair market value as set forth above. In short, the court places absolutely no credence in the testimony of Fletcher Lewis.

That leaves the question of whether this court should award punitive damages against the defendants to deter them and others from similar conduct in the future. "Punitive damages may be imposed upon a defendant who knew or had reason to know that his course of conduct was about to inflict injury but who nonetheless continued on this course with a conscious indifference to the consequences." *Brown v. Missouri Pacific R.R.*, 703 F.2d 1050 (8th Cir.1983). *See also* Arkansas Model Jury Instruction 2217 and the cases cited thereunder.

■ The court believes that anyone reading this opinion would, by this point, understand that this court believes that defend-

ants' conduct in this case was nothing short of outrageous. Under those circumstances, the court thinks that, if there was ever a case for punitive damages to be imposed, this is it. Under the circumstances, and because of the evidence outlined above, the court finds that the plaintiff should recover, and the defendants should have imposed against them, punitive damages in the amount of $20,000.

A judgment will be contemporaneously entered accomplishing the matters set forth above.